# EXHIBIT A

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

---

Al Maya Trading Establishment,

     *Claimant,*

v.                                            Case No. 01 14 0001 3760

Global Export Marketing Co., Ltd.,

     *Respondent.*

---

## FINAL AWARD

     WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with the Stipulation and Order, dated August 27, 2014 (the "Stipulation and Order"), signed by the parties and so-ordered by U.S. District Judge Paul A. Engelmayer, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, FIND and AWARD, as follows:

**Introduction and Procedural History**

1.     This international arbitration is the result of binding commitments, made by Al Maya Trading Establishment ("Al Maya") and Global Export Marketing Co. Ltd. ("Gemco"), in an Agency Agreement, dated June 16, 1999 (the "Agreement"), and the Stipulation and Order.

2.     Pursuant to the Agreement, Al Maya served as Gemco's exclusive distributor of Gemco's American Garden ("American Garden" or "AG") line of food products in the United Arab Emirates (the "U.A.E."). Al Maya alleges that Gemco breached the Agreement by unilaterally terminating it on September 26, 2013. Al Maya further alleges that it served as Gemco's exclusive distributor of other products in the U.A.E. pursuant to separate oral contracts, and that Gemco also breached these contracts by terminating them on September 26, 2013.

3.     On January 14, 2014, Al Maya filed a petition in the Southern District of New York seeking to compel arbitration (the "SDNY Litigation"). Gemco opposed that petition on the grounds that its business dealings with Al Maya were based on oral agreements, which did not include an arbitration clause, and that the Agreement, which does contain an arbitration clause, was a forgery. Following eight months of litigation in the Southern District of New York, which focused on whether the signature of Gemco's President on the Agreement was forged, Al Maya and Gemco executed a "Stipulation and Order," which U.S. District Judge Paul A. Engelmayer so-ordered on August 27, 2014. In that Stipulation and Order, Al Maya and Gemco agreed to arbitrate their dispute. (Al Maya Ex. 2.) The Stipulation and Order provides that:

1

1) The parties agree to submit to arbitration all claims arising out of or related to the 1999 Agency Agreement. Petitioner will serve a statement of claim within 14 days from the date of this Order

2) The American Arbitration Association shall administer the arbitration pursuant to its Rules for Commercial Arbitration;

3) The authenticity, validity, and enforceability of the 1999 Agency Agreement shall not be at issue in the arbitration and no reference to its validity, the authority of the signatories to sign the agreement, or any other issue related to its formation shall be raised in the arbitration;

4) New York law shall apply in the arbitration to all procedural and substantive issues;

5) Each party shall bear its own costs in connection with this proceeding, but the arbitrators will have discretion in awarding costs in the arbitration to award any costs and attorneys' fees associated with this proceeding;

4.     On September 4, 2014, Al Maya submitted its Demand for Arbitration to the American Arbitration Association/ International Centre for Dispute Resolution ("AAA/ICDR"). On September 22, 2014, Gemco submitted its Answer. On April 3, 2015, the ICDR confirmed Grant Hanessian, Robert G. Cohen, and Daniel Schimmel as arbitrators, with Daniel Schimmel serving as Chairperson.

5.     A Preliminary Hearing was held by telephone on April 22, 2015. The parties confirmed that the Commercial Arbitration Rules of AAA/ICDR, and New York substantive and procedural law applied. Both parties indicated that they would seek document production. They both requested to conduct the depositions of fact and expert witnesses, which the Panel allowed.

6.     In Procedural Order No. 1, the Panel established a process for the presentation of witness testimony in the arbitration. The parties agreed to identify, prior to the merits hearing, all witnesses who would testify at the arbitration hearing.[1] The Panel issued a disclosure and briefing schedule leading to a merits hearing in September 2015.

7.     Numerous discovery disputes occurred between May and August 2015, which focused on fact and expert discovery. Each time, the Panel ruled within a few business days after receiving written submissions from both sides.

8.     Following two rounds of pre-hearing submissions involving witness statements, briefs, expert reports, and exhibits, the arbitration hearing took place from September 16 to 21, 2015. The parties submitted over 500 exhibits. Two fact witnesses testified on behalf of Al Maya, Deepak Pagarani (Al Maya's CEO) and Ashok Purswani (Al Maya's official in charge of the relationship with Gemco). Two fact witnesses testified on behalf of Gemco, Kevin Egan (Gemco's President) and Biju Panicker (Gemco's official in charge of the relationship with Al

---

[1] In Procedural Order 1, the Panel ruled that consistent with a common practice in international arbitration, the direct examination of witnesses would take the form of sworn written witness statements, and that these witnesses would be made available for cross-examination at the hearing.

Maya).  Both sides offered expert testimony from Carlyn Irwin (Al Maya's expert) and Maureen S. Loftus (Gemco's expert).

9.     Following the arbitration hearing, the Panel requested that the parties brief five specific topics.  Post-hearing briefs and rebuttal post-hearing briefs were submitted by both parties on October 23 and November 6, 2015.  Oral argument took place on January 12, 2016.  A final, fifth round of written submissions, addressing the calculation of damages relating to non-AG products, occurred on January 20-29, 2016.

**Facts**

10.     The Claimant Al Maya is a United Arab Emirates company.  It is a family-owned business that, among other things, distributes food products in the U.A.E., the Middle East, and Europe.  These products are supplied to Al Maya by suppliers around the world.  (Demand for Arbitration, ¶ 1.)  Respondent Gemco is a family-owned company organized under the laws of the state of New York and with a principal place of business in New York City.  (Answer, at 1.)  Since its founding in 1988 in New York City, Gemco has been in the business of exporting foodstuffs and related products.  It currently exports to distributors in approximately 50 countries well-known brands, such as Ken's Salad Dressings, Sweet Baby Ray's Barbeque Sauce, French's Mustard, Keebler crackers and cookies, Sioux Honey Association's Sue Bee Honey, and its own AG labeled brand.  (*Id.* at 3-4.)

11.     Beginning in 1988, Gemco began exporting products to the U.A.E..  From 1988 to 2003, Gemco primarily shipped its products to corporate distributors owned by the Pagarani and Ganwani families in Dubai.  (Egan W. St. ¶¶ 15-20.)[2]  In 2003, these two families separated their business interests, and Gemco began shipping its products, including its AG brand, to the Al Maya Group, a group solely owned by the Pagarani family.  (*Id.* ¶¶ 21-27.)  It continued to do so until September 2013.  (*Id.*)

12.     From 1988 to 2013, "Gemco did not give much thought to the name of the company to which it was selling in Dubai."  (*Id.* ¶ 29.)  "Rather, Gemco focused more on the operational reality that it was doing business first with companies owned by both the Pagarani and Ganwani families and later with a company owned only by the Pagarani family" within the Al Maya Group.  (*Id.* ¶ 30; Tr. 457-459, 466-67, 503.)

13.     In the Agreement, Gemco appointed Al Maya Trading Establishment, also referred to as AMTE, as the "Sole Agent/Exclusive Distributors for the 'merchandise' [defined in the contract as AG branded items] for the entire territory of the U.A.E.".  (Al Maya Ex. 1.)  Over the years Gemco shipped a variety of brands to Al Maya, but the scope of the 1999 Agreement was limited to the distribution of AG products.  (Al Maya Ex. 1.)

14.     It is undisputed that Zams International FZCO ("ZAMS"), an affiliate of Gemco, entered into a separate oral agreement with the Al Maya Group to be the exclusive distributor of Diamond aluminum foil in the U.A.E.  (Egan W. St. ¶¶ 46-47).  While the parties agree that the Al Maya Group distributed other Gemco products under oral understandings, their terms,

---

[2] " __ W. St." refers to the parties' witness statements in the arbitration.

including whether Al Maya was the exclusive distributor of these additional products, are disputed. (Egan W. St. ¶¶ 49-52.)

**Relevant terms of the Agreement**

15.     The Agreement is only two-pages long.  A key provision for purposes of this arbitration is set forth in Article 8 (renewal and termination) and provides that:

> 08.     This agreement shall remain valid for a period of two (2) years from the date herein above written in this Agreement and hall [sic] automatically renewed for equal period(s) unless either party informs the other in writing at least three (3) months in advance of its intention to terminate this agreement.  Either party reserves the right to terminate this arrangement by giving the other party clear three (3) months written notice of its intention to do so.

16.     The Agreement further provides that AMTE would promote sales of American Garden products in the U.A.E. and would "make arrangements for necessary advertisements and or promotions, etc. as may be mutually [agreed] by and between the parties hereto from time to time." (Al Maya Ex. 1, Article 5.)  Gemco would supply AG goods to AMTE "at such price or prices as is / are mutually agreed between the parties." (*Id.*, Article 6.)  Gemco reserved "all of its rights concerning the Trade marks, Brand Names and Designs of [American Garden goods] except for AMTE being authorized to use the said Trade Marks and or Brand Names including Designs for the purpose of marketing [American Garden goods] in its capacity as Agent/Distributor of the [American Garden goods]." (*Id.*, Article 7.)

**Facts leading to the termination of the Agreement (2005-2013)**

17.     According to Gemco, beginning in 2005 or 2006, Al Maya breached the Agreement in numerous different ways.  Among other things, Al Maya allegedly (1) sold private label goods (i.e., products bearing Al Maya's own brand names) in competition with Gemco's AG products; (2) was unable to competently handle major accounts in Dubai; (3) lacked transparency and refused to provide Gemco with key information regarding the sale of AG products; (4) had a weak distribution structure; (5) had poor warehouse operations; (6) had poor forecasting and order systems and outright refused to order goods; and (7) improperly administered its sales force and the distributorship function.  Al Maya also distributed products from Heinz, a competitor of Gemco; photos submitted by Gemco as arbitration exhibits indicate that retailers in the U.A.E. displayed these competing products on space reserved for AG products. (Tr. at 263-269, 326-327, 381, Gemco Ex. 291.)[3]  According to Gemco, these breaches led to a significant decline in the market share of AG products. (*Id.* ¶¶ 53-115; Tr. at 379-80.)

18.     According to Gemco, in approximately 2011-2012, the situation went "from bad to worse." (Egan W. St. ¶¶58-63; Tr. 826-27.)[4]  In 2011, one of Al Maya's divisions, Al Manal

---

[3] In 2005 and 2006, Al Maya also distributed goods under the AG label that were not supplied by Gemco. (Tr. 271-275.) In response, Gemco sent cease and desist letters to Al Maya to cease its infringement of the AG label, and Al Maya apparently complied. (Tr. at 88-90.)

[4] Al Maya's compensation structure changed in 2011. Until then, Al Maya was free to set its margin on Gemco's products sold in the U.A.E. In January 2011, in light of Al Maya's performance problems, Gemco changed the

Food Packing Division ("Al Manal"), built a factory in the U.A.E. designed to manufacture Al Maya's own mayonnaise, salad dressings, and sauces. (Gemco Ex. 80.) Mayonnaise was Gemco's top selling product in the U.A.E., and dressings and ketchup also were among Gemco's top selling products. (Egan W. St. ¶ 112.) Al Manal promoted to potential customers the new factory's ability to "knock off" mayonnaise, including Gemco's products.

19.     For instance, on January 12, 2012, an Al Manal representative sent an email to a potential customer stating that "[a]s far as the Mayo goes, we commissioned the plant last year in August. It has the latest equipment and facilities by Frycoma out of Sweden. We have the capacity to produce 22 Tons per day at the moment, along with ketchup and mustard if so desired. We are able to perfect any taste or consistency as per the customer demand. In other words, whatever you would like us to knock off for you or if you have your own desired recipe, we can do it." (Gemco Ex. 79; Tr. 152.) Internal Al Maya emails also emphasized its "state of art plant" capable of manufacturing mayonnaise, tomato ketchup, salad dressings and sauces. (Gemco Ex. 80.)

20.     According to Mr. Panicker, Al Maya gave financial incentives to its sales force to promote the sale of its own private label products instead of Gemco's products. (Tr. 818-19.) In addition, Mr. Panicker testified that, for a period of time, Al Manal executives were able to access confidential sales data of AG on Al Maya's computers. (Tr. 819-825, 899-901.) Al Manal was not supposed to have access to such information and improperly used it to identify AG customers and target them. (*Id.*) Al Manal executives told AG customers that "being manufacturer, [Al Manal] can give better price and prompt product availability and also tell customers that American Garden mayo is not so good." (Tr. 823, 25.)

21.     Mr. Panicker learned this information from discussions with two Al Maya employees and also personally observed Al Manal's conduct when he was seconded to Al Maya's offices in Dubai. (Tr. 806, 819-20, 825.)[5] At some point, Al Maya implemented changes in its computer systems to block the access of Al Manal executives to Gemco's confidential information. (Tr. 906-07.) By then, however, the harm was done. Mr. Panicker testified that, prior to that time, Al Manal was able to target at least one "very important customer to us, Golden Fork. It's been, in fact, among the top five customers to us." (Tr. 903.) Mr. Panicker testified that, as a result of Al Manal's conduct, AG customers, including restaurant chains, had an incentive to blend AG mayonnaise with cheaper Al Maya mayonnaise, or to simply substitute AG products with cheaper competing Al Manal products. (Tr. 372, 925-29.) According to Mr. Panicker, Al Manal offered its own mayonnaise to Golden Fork at 104 dirhams a gallon, which was cheaper than Gemco's 135 dirhams per gallon. (Tr. 927.) In order to persuade the customer to resume its orders of AG products, Gemco "worked out a reduced American Garden price" and persuaded the customer to switch back after several months. (*Id.*) Mr. Panicker testified, however, that Gemco ultimately lost that customer because "we couldn't continue doing that because it was even below our landed cost. So after a couple of months, then I said there's no point in doing this business because the harm's already been done." (*Id.*) In contrast, Mr. Pagarani testified at

---

compensation structure. It provided Al Maya with a fixed 19 percent margin and also agreed to pay Al Maya 8 percent of the shipment value of AG products as advertising and promotion spending. (Egan St. ¶ 221; Tr. at 119-20, 383, 699.)
[5] Mr. Panicker was based in Al Maya's offices in Dubai and had conversations with Al Maya employees, such as Surya Prakash, Al Maya's trade marketing executive. (Tr. 819-20.)

the hearing that Gemco lost Golden Fork because of a price increase, and that Golden Fork "bought their mayonnaise elsewhere for six months;" Al Maya only started to supply its own mayonnaise to Golden Fork after a period of time. (Tr. 150-51.) According to Mr. Pagarani, once Gemco agreed to reduce the prices charged to Golden Fork, Al Maya "withdrew and we gave them -- I let them supply." (*Id.* at 151.)

22.     In addition, Mr. Egan testified that the "real turning point" in the decision to terminate Al Maya was in late 2012, "the day we found out that they actually duplicated our exact label, our American Garden label, with a different name on it.  It was called Global Choice, very original.  And the actual label was a direct knock-off of our label.  We found the product in Nepal on one of our people's visit to Nepal, and we also found out it was produced in their factory.  We've got pictures in our -- one of our books from their factory with this mayonnaise in their factory." (Tr. 513-14.)

23.     Al Maya generally denies Gemco's allegations of misconduct.  But both sides agree that it is highly unusual for a distributor of goods in the U.A.E. to itself manufacture competing products. (Tr. 342-43; 200-01.) Mr. Pagarani, Al Maya's Chief Executive Officer, testified that it is "not typical" for a distributor of food products to manufacture its own substantially similar products. (Tr. 200-01.) Mr. Egan similarly testified that he knows 30 distributors in the U.A.E., including the top 10. (Tr. 342.) Only two of them both manufacture products and are also distributors for key brands. (*Id.*) Mr. Egan made clear that neither of these two distributors manufactures products that compete with the key brands they distribute. (*Id.* at 342-43.)

24.     Starting in 2012, Gemco experienced a sharp decline in its market share in the U.A.E. for mayonnaise, ketchup, and salad dressings. (Tr. 356, 362-68; Gemco Ex. 59.) In January 2012, Gemco's AG salad dressings had a 30.5 percent market share in the U.A.E. (Tr. 364.) By October 2013, its market share had declined to 18.7 percent. (*Id.*) AG mayonnaise, its top selling product in the U.A.E., declined from a market share 24.8 percent to 17 percent during that same period. (*Id.* 366.)[6] The growth rate of AG products was as follows:

---

[6] This decline in market share is reflected in data provided by Nielsen, the most reliable source of information on this topic. (Tr. at 882.) Al Maya has pointed out that another company, Euromonitor, also provided market share data, and that Gemco occasionally relied on Euromonitor.  Nielsen's data, however, was more reliable because it is based on objective data from sales at key accounts. (Tr. 362-63.)



25.     At the same time, between 2010 and 2013, Al Maya's sales of private label goods increased by approximately 300%. (Gemco Ex. 74.)  During that time period, Al Manal's sales of private label mayonnaise for consumption within the U.A.E. increased by 413%.  (*Id.*)  The financial impact of Al Maya's competition, however, was not yet significant by the time of the termination, in September 2013.  From 2010 to 2013, Al Manal's actual sales of competing products for consumption within the U.A.E. only amounted to $6,652,000.  In contrast, Al Maya sold $26,899,000 of AG goods in the U.A.E. in 2012 alone.  (Irwin Rep. at 31-32.)[7]

26.     In late 2012, based on the conduct described above, Gemco decided to terminate its relationship with Al Maya and engaged in discussions with other distributors.  (Tr. at 396-98, 427-27, 501-02; 511, 518-20; Al Maya Ex. 14.)  The reasons underlying Gemco's decision had all materialized prior to early 2013, and Gemco could have given Al Maya notice of termination by March 16, 2013, the last day to do so under Article 8 of the Agreement.  (Tr. 353, 377-394, 396-97.)[8]

27.     In the summer of 2013, in preparation for its transition to new distributors, Gemco stopped fulfilling Al Maya's orders.  (Al Maya Exs. 17, 18.)  Gemco, however, did not immediately advise Al Maya of its decision to terminate the Agreement; instead, in a meeting with Al Maya in August 2013, Mr. Egan reiterated its complaints about Al Maya's conduct and performance.  (Egan St. ¶ 360.)  Mr. Pagarani responded that Al Maya "was not making money. His operating expenses were very high and he could not make money on AG based on the margins that he was making in those days."  (Tr. 371.)

---

[7] "__ Rep." refers to the parties' expert reports in the arbitration.
[8] As a result of the Stipulation and Order, Gemco cannot dispute that the Agreement was valid and enforceable, and that it automatically renewed in June 2013.  (Al Maya Ex. 2.)

28.     Mr. Egan conveyed Gemco's decision to terminate the Agreement to Al Maya in a meeting with Messrs. Pagarani and Purswani in Dubai, on September 26, 2013. (Egan W. St. ¶ 374.) Mr. Pagarani immediately asked Gemco to reconsider its decision and for the first time offered to close its new factory. (Tr. 371.) Gemco rejected that offer and, on September 28, 2013, Mr. Egan sent an email to Al Maya indicating that Gemco's decision to terminate "is final, all brands." (Al Maya Ex. 19; Egan W. St. ¶ 384.) Mr. Egan offered to set up a meeting to discuss the disposal of Al Maya's inventory.

29.     In an October 2, 2013 email, Gemco followed-up on the topic of the inventory. It gave Al Maya three options as follows. (Gemco Ex. 163, Egan W. St. ¶ 389.) Specifically, (1) Al Maya could "service" the trade for 20 days to sell the remaining stock, and Gemco would then purchase the remaining products; (2) Gemco offered to immediately buy back all of the remaining stock; and (3) Gemco offered to provide Al Maya with 20 days to sell the remaining stock before Gemco's new distributor (NTDE) began selling AG products. A meeting was scheduled for October 3, 2013 to discuss these options. (Tr. 830-32, 1029.) At that meeting, however, Al Maya declined to discuss them and instead took the position that Gemco was bound by a written distribution agreement. *(Id.)*

30.     Al Maya subsequently kept the inventory and, in March 2014, requested Gemco to buy back the unsold portion, which Gemco declined to do because the inventory was at, or close to, expiration. Al Maya then negotiated with the new distributor which agreed to buy the AG products and paid Al Maya $700,000. Apparently, some of the products could not be sold by that new distributor (NTDE) for expiration reasons, and Gemco reimbursed NTDE $62,000 for the expired goods. (Egan W. St. ¶¶ 414-418; Egan Rebuttal W. St. ¶¶ 139-142.)

31.     In October 2013, Al Maya took steps to locate new suppliers in the U.S. and approached two companies that were doing business with Gemco. Subsequently, Gemco wrote to some of its business partners in the U.S. and asked them not to do business with Al Maya. (Al Maya Exs. 24 & 25.) On October 9, 2013, AMTE wrote to Gemco. (Al Maya Ex. 24.) This letter claimed that, pursuant to the Agreement, Al Maya was the exclusive distributor of American Garden products in the U.A.E. and asked Gemco to "immediately stop dealing with any third party as we are the exclusive distributor for the merchandise [AG] in the designated territory." *(Id.* at 2.)

32.     In a letter from Gemco to AMTE, dated October 15, 2013, Gemco responded that "[w]e did not sign any valid exclusive distributorship with your company," and that [o]ur termination has not been unilateral. Based on the business relationship we have had, we have on several occasions verbally and in writing made you aware of our dissatisfaction with your performance, etiquette, target failures and non-achievement of various KPIs that were agreed to and suggested remedial action. These were never acted upon by you." (Al Maya Ex. 27.)

33.     On January 14, 2014, after Gemco refused to arbitrate the dispute, Al Maya filed a petition to compel arbitration (the SDNY Litigation).

**Legal Analysis**

**A. Arbitrability**

34.     In the Stipulation and Order, filed August 27, 2014, AMTE and Gemco "agree[d] to submit to arbitration all claims arising out of or related to the 1999 Agency Agreement." (Al Maya Ex. 2, ¶ 1.) AMTE submitted its Demand for Arbitration on September 4, 2014. The parties have severally agreed that the Commercial Arbitration Rules of AAA apply, an agreement set forth in the Stipulation and Order. The parties reiterated it in the telephonic hearing with the Panel on April 22, 2015. (*Supra* at 2.) AAA's Commercial Arbitration Rules state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement, or to the arbitrability of any claim or counterclaim." (AAA's Commercial Arbitration Rules, Rule 7(a).) The parties' incorporation by reference of the Commercial Arbitration Rules reflects their clear and manifest intent to have all arbitrability questions resolved by the Panel. *Contec Corp. v. Remote Solution Co., Ltd.*, 398 F.3d 205, 208-211 (2d Cir. 2005) (incorporation by reference of the AAA Commercial Arbitration Rules in the arbitration agreement reflects parties' intent to delegate question of arbitrability to the arbitrator); *C.J. Mercadante v. XE Services*, LLC, 78 F.Supp.3d 131, 138-39 (D.D.C. 2015) (numerous Circuits have concluded that incorporation of the AAA rules constitutes clear and unmistakable evidence that the parties intended the question of arbitrability to be decided by the arbitrators) *See also Oxford Health Plans, LLC v. Sutter*, 133 S. Ct. 2064, 2068 n.2 (2013); *Bell v. Cendant Corp.*, 293 F.2d 563, 566 (2d. Cir. N.Y. 2002) (whether arbitration clause applies to a dispute is for the courts to decide absent clear and unmistakable evidence that the parties intended the arbitrator to resolve the matter).

35.     The U.S. Supreme Court and the Court of Appeal for the Second Circuit have held that the language "arising out of or related to" in a dispute resolution clause is broad. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 US 395, 406 (1967) (an arbitration clause governing "[a]ny controversy or claim arising out or relating to this Agreement" is broad); *Mehler v. Terminix Int'l Co. L.P.*, 205 F.3d 44, 49-50 (2d Cir. 2000). All of Al Maya's claims in this arbitration arise out of or relate to the Agreement.

36.     Gemco does not dispute that Al Maya's claims relating to AG products are all arbitrable. In a letter to the Panel, dated January 20, 2016, which Gemco submitted after the arbitration hearing on the merits, it for the first time argued that Al Maya's claims of breach of contract relating to non-AG products were not arbitrable. According to Gemco, these claims did not arise or relate to the Agreement. Gemco made that argument for the first time in the fifth and final round of briefing, which was supposed to address a different question from the Panel about the calculation of damages. The Panel subsequently asked the parties to brief the topic of arbitrability and now rejects Gemco's argument for two independently sufficient reasons: (1) Gemco has waived any objections on the arbitrability of Al Maya's claims; and (2) in any event, Al Maya's claims are all within the scope of the submission to arbitration in the Stipulation and Order.

37.     In the SDNY Litigation, Al Maya put Gemco on notice that it would seek to arbitrate claims relating to non-AG products. Al Maya alleged that, in addition to claims focusing on AG products, "in apparent retaliation for Al Maya's assertion of its contractual rights with respect to

American Garden brand products, Gemco has stopped supplying Al Maya with products from other brands that Al Maya had previously distributed for Gemco.  Al Maya has suffered additional damages as a direct and proximate result of this retaliatory conduct by Gemco."  (Al Maya's Petition for an Order Directing Arbitration and Appointing An Arbitrator Or, In The Alternative, For Other Relief, filed January 14, 2014, ¶ 59, Al Maya Ex. 3.)  Subsequently, in the arbitration, the parties actually litigated the merits of all of Al Maya's claims without any objections from Gemco on arbitrability grounds.  Al Maya requested the production of documents relating to both AG and "any other product that Global supplied to Al Maya."  (Al Maya's Request for the Production of Documents, Requests Nos. 8, 10, 11, 13-14, 18, and 19.)  In response, Gemco produced documents relating to non-AG products, again without raising any objections on arbitrability grounds.  (Gemco's Responses and Objections to Claimant's Requests for the Production of Documents, at 9.)  The parties actively arbitrated the merits of these claims, without any objections to their arbitrability, and submitted witness statements, expert reports, briefs, and exhibits addressing the merits of all of Al Maya's claims.  Al Maya's and Gemco's witnesses testified about them at the arbitration hearing.

38.     On January 12, 2016, the Panel heard closing arguments.  Gemco again did not raise any issues regarding the arbitrability of Al Maya's claims.  At the end of oral argument, the Panel asked the parties to submit final submissions on the topic of Al Maya's potential damages in connection with non-AG products.  Gemco's letter, dated January 20, for the first time raised an objection to the arbitrability of non-AG products.  The Panel asked the parties to identify specific record citations in which Gemco had previously argued that these claims were not arbitrable; the parties' submissions confirmed that Gemco did not previously do so.  Accordingly, Gemco's decision to arbitrate all of the claims on the merits amounts to a waiver of any objections to the arbitrability of these claims.  *Local Union No. 1 of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipe Fitting Indus. v. Bass Plumbing & Heating Corp.,* 2014 U.S. Dist. LEXIS 183085, at *24-25 (E.D.N.Y. Oct. 28, 2014) (finding that a party that participates in an arbitration waives its rights to object to the arbitration); *N.Y. City Dist. Council of Carpenters Pension Fund v. Tadco Const. Corp.,* 2008 WL 540078, at *14-15 (S.D.N.Y. Feb. 28, 2008); *See also, Kamakazi Music Corp. v. Robbins Music Corp.,* 684 F.2d 228, 231 (2d Cir. 1982) (party demonstrated its agreement to submit claims to arbitration through its conduct).  If Gemco believed it had any objections to the arbitrability of non-AG claims, it should have raised them at the beginning of the arbitration proceedings, not in its final submissions.

39.     In any event, the Panel concludes that all of the claims in this arbitration are within the scope of the parties' submission to arbitration in the Stipulation and Order.  That is because Al Maya's claims focusing on non-AG products *relate to* the principal-distributor relationship set forth in the Agreement.

40.     Gemco contends that it has consistently taken the position that the Agreement only mentioned AG products and did not govern the distribution of other products.  That argument misses the point.  When an arbitration clause states that all disputes that *arise out of or relate to* the contract shall be arbitrated, that broad arbitration clause encompasses not only disputes that directly involve the terms of the contract (i.e., disputes that arise out of it), but also disputes that relate to the contract in a broader sense.

41.     In this arbitration, Al Maya's claim that Gemco breached an oral agreement to distribute non-AG products in the U.A.E. relates to the principal-distributor relationship referenced in the Agreement. That is because (1) the subject matter of all of Al Maya's claims focuses on the principal/distributor relationship; (2) the claims and defenses involve partially overlapping conduct and evidence; (3) all of the claims and defenses involve the same general time frame; and (4) all of Al Maya's claims arise from Gemco's termination of the parties' relationship on September 26, 2013. Accordingly, there is no question that all of Al Maya's claims are within the scope of the submission to arbitration in the Stipulation and Order.

**B. Standing**

42.     On February 26, 2014, in the SDNY Litigation, Gemco moved to dismiss Al Maya's petition to compel arbitration. (Opinion and Order, dated July 15, 2014, Al Maya Ex. 38, at 2.) In its reply motion papers, Gemco for the first time argued that AMTE "was not a 'proper party in interest' because a different Al Maya corporate entity had been Global's distributor in the United Arab Emirates since 2002. Global MtD Reply Br. 6." (*Id.* at 20.) Judge Engelmayer held that this was a merits issue that should be decided by the arbitrators.[9]

43.     As described above, the testimony of Mr. Egan indicates that, between 1988 and 2013, "Gemco did not give much thought to the name of the company to which it was selling in Dubai." (Egan W. St. ¶ 29.) "Rather, Gemco focused more on the operational reality that it was doing business first with companies owned by both the Pagarani and Ganwani families and later with a company owned only by the Pagarani family" in the Al Maya Group. (*Id.* ¶ 30; Tr. 457-459, 466-67, 503.)

44.     The evidence demonstrates that Gemco dealt with Al Maya entities interchangeably treating them effectively as the same entity, i.e., the Al Maya Group. At the arbitration hearing, Mr. Egan acknowledged that Gemco's termination letter, dated October 6, 2013, was addressed to "Al Maya Group," and that he assumed that "Al Maya Group" was the umbrella name for the family of organizations." (Al Maya Ex. 40; Tr. 458.)

45.     In addition, Gemco subsequently wrote to <u>AMTE</u>, the Claimant in this arbitration. That letter, dated October 15, 2014, specifically stated that:

> Based on the business relationship <u>we</u> have had, we have on several occasions verbally and in writing made <u>you</u> aware of our dissatisfaction with <u>your performance</u>, etiquette, target failures and non-achievement of various KPIs that were agreed to and suggested remedial action. These were never acted upon <u>by you</u>." (Al Maya Ex. 27) (emphasis added).

46.     The Panel rejects Gemco's standing arguments for three reasons. First, AMTE is a party to the Agreement. (Al Maya Ex. 1.) Gemco's letter, signed by Mr. Egan, was addressed to the

---

[9] Gemco subsequently "slightly recast" its argument and claimed that AMTE "lacked standing to bring this action, because, in fact, Global had business dealings with a different entity, Al Maya International Zone, not Al Maya Trading Establishment, the petitioner here." (Al Maya Ex. 38 (Opinion & Order, dated July 15, 2014, at 20.) Consistent with his March 29, 2014 decision, Judge Englemayer determined that "this issue bore on liability and/or damages and thus was one for the ultimate factfinder to decide." *(Id.)*

Claimant in this arbitration.[10]  (Al Maya Ex. 27.)  AMTE has standing to assert the claims in this arbitration.

47.     Second, because Gemco dealt with Al Maya affiliates interchangeably for 11 years, treating them effectively as the same entity, it is estopped from now insisting that AMTE has no standing to assert its claims, or that AMTE suffered no damages. *See, e.g., Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 360 (2d Cir. 2008) (estoppel principles apply where party dealt with affiliates interchangeably treating them effectively as the same entity).  Gemco is estopped from insisting on the respect of corporate formalities when it previously ignored them while accepting payments from the Al Maya Group for AG products.

48.     Third, in the Stipulation and Order, Gemco expressly agreed not to challenge the validity or enforceability of the Agreement, which expressly identifies AMTE as its exclusive distributor of AG products in the U.A.E. (Al Maya Ex. 2.)  Gemco cannot now credibly insist that it had a different exclusive distributor of the same products in the same territory.

## C. Election of remedies

49.     Under New York law, an exclusive distributor has an obligation to undertake good faith, reasonable efforts to market and sell the products. *See, Zilg v. Prentice Hall, Inc.*, 717 F.2d 671, 680 (2d Cir. 1983); *New Paragigm Software Corp. v. New Era of Networks, Inc.*, 2002 U.S. Dist. LEXIS 23753,*41-44 (S.D.N.Y. Dec. 9, 2002) (citing *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 118 N.E. 214 (1917)).  New York law does not impose an implied obligation not to market a competing product, so long as the exclusive distributor made reasonable efforts to market its principal's products.

50.     The Panel finds that the testimony of Messrs. Egan and Panicker regarding Al Maya's performance and conduct is generally credible.  But regardless of whether Al Maya's conduct amounted to a material breach of its contractual obligations, the Panel must determine whether Gemco elected its remedies under New York law, with the consequence that Gemco could not properly terminate the Agreement in September 2013.  The terms of the Stipulation and Order mandate, to a significant extent, the result of that analysis.

51.     In that Stipulation and Order, Gemco expressly stipulated and agreed that the "authenticity, validity, and enforceability of the 1999 Agency Agreement shall not be at issue in the arbitration and no reference to its validity, the authority of the signatories to sign the agreement, or any other issue related to its formation shall be raised in the arbitration." (Al Maya Ex. 2, ¶ 3.)  The Stipulation and Order is binding in this arbitration.  It follows from Gemco's binding commitment that the Agreement automatically renewed for two years on June 16, 2013.

52.     The parties agree that Gemco could have given written notice of termination to Al Maya by March 16, 2013, the last day to timely do so under Article 8 of the Agreement. (Al Maya Ex. 1, Article 8; Tr. 353, 377-394, 396-97.)  Gemco does not dispute that all the reasons justifying

---

[10] Gemco contends that AMTE is owned by Mohammed Essa Mohammed Al Samt, not the Pagarani family. (Answer at 6.)  It is true that Mr. Al Samt is the "nominee owner" of AMTE. (Gemco Ex. 191.)  But the Al Maya Group "is the actual and sole owner of 100% share of Al Maya Trading Est" held by him. (Gemco Ex. 191.)

the termination existed as of that date.  (*Id.*)  Accordingly, under New York law, the key question is whether Gemco could terminate the Agreement in September 2013, as a result of breaches of contract that occurred prior to the March 16, 2013 deadline to give written notice of termination.

53.     Federal and state courts in New York have held that, when a party materially breaches a contract, the non-breaching party must choose between two remedies.  *See ARP Films, Inc. v. Marvel Entertainment Group*, 952 F.2d 643, 649 (2d Cir. 1991); *Bigda v. Fischbach*, 898 F.Supp. 1004, 1011 (S.D.N.Y. 1995); *ESPN, Inc. v. Office of the Commissioner of Baseball*, 76 F.Supp.2d 383, 387-389 (S.D.N.Y. 1999); *331 E. 34th St. LLC v. 331 E. Corp.*, 293 A.D.2d 361, 740 N.Y.S.2d 327 (App. Div. First Dep't 2002).  The non-breaching party can elect to terminate the contract and sue for total breach, or it can affirm the contract by continuing to perform while suing for partial breach.  *Id.*  "A party can indicate that he has chosen to continue the contract by continuing to perform under the contract or by accepting the performance of the breaching party."  *Bigda*, 898 F.Supp. at 1011.  "Once a party elects to continue the contract, he can never thereafter elect to terminate the contract based on that breach."  *Id.*; *See also, V.S. International S.A. v. Boyden World Corp.*, 862 F.Supp. 1188, 1196 (S.D.N.Y. 1994).

54.     "The operative factor in the election doctrine is whether the non-breaching party has taken an action (or failed to take an action) that indicated to the breaching party that he has made an election."  *Bigda*, 898 F.Supp. at 1013 (quoting *5 Williston, Contracts*, ¶ 684 (3d ed. 1961)); *331 E. 34th St. LLC*, 293 A.D.2d 361, 740 N.Y.S.2d327.  Detrimental reliance is not an essential element of an election of remedies defense.  *See ESPN, Inc.*, 76 F.Supp.2d at 388 n.3.

55.     Here, until September 2013, Gemco and Al Maya were parties to a long-term contractual relationship that automatically renewed every two years.  In January 2013, Gemco invited Al Maya to place orders of AG goods.  (Al Maya Ex. 100.)  In the following nine months, Gemco wrote emails to Al Maya regarding its obligation to reorder AG goods.  (Gemco Exs. 43, 45, 46, 47, 48.)  Gemco insisted that Al Maya was required to comply with its contractual obligations.  Gemco also expressed concerns to Al Maya about its continuing poor performance and conflicts of interests.  But Gemco also stated that "[w]e have always stated that we are continuing business with you considering management personal and long relationship at both end."  (Gemco Ex. 244) (April 15, 2013 e-mail from Gemco to Al Maya).  Accordingly, Gemco performed in a manner consistent with the continued validity of the Agreement and elected its remedies.  *See ARP Films, Inc.*, 952 F.2d at 649; *Bigda*, 898 F.Supp. at 1011; *ESPN, Inc.*, 76 F.Supp.2d at 387-389; 331 E. 34th St. LLC, 293 A.D.2d 361, 740 N.Y.S.2d327.  Gemco could not at the same time renew the Agreement in June 2013 and seek to terminate it based on alleged prior breaches.[11]

56.     Gemco's counsel contends that an election of remedies requires "an affirmative action of some kind."  (Gemco's Answers to the Panel's October 2, 2015 Questions, at 2.)  Between January and September 2013, Gemco took affirmative steps reaffirming the existence of the contract.  (*Supra* ¶ 55.)  In addition, under New York law, an election of remedies generally "need not be made until the time comes when the party making the election must render some performance under the terms of the contract.  At this point, 'either performing or failing to perform will indicate an election.'"  *Lucente v. IBM*, 310 F.3d 243, 259 (2d Cir. 2002) (quoting

---

[11] Gemco also did not allege nor prove any new material breaches between March 16 and June 16, 2013.

*Bigda*, 898 F.Supp. at 1004.) Gemco's election of remedies occurred when it failed to give written notice of termination prior to the March 16, 2013 deadline and allowed the Agreement to renew 90 days later.

57.     Gemco also contends that it "constantly protested to Ltd (FZC) about its serious shortcomings and repeatedly warned Ltd (FZC) about the potential consequences." (Gemco's Answers to the Panel's October 2, 2015 Questions, at 4.) Gemco states that there is no "clear and unequivocal" evidence of Gemco's intent to waive its rights. (*Id.*) There is a key difference, however, between (1) Gemco's failure to waive its contractual right to sue for partial breach and (2) its election of remedies by allowing the Agreement to renew. As described in *ESPN*, "[i]n contrast to a waiver of contractual rights, an election is simply a choice among remedies by the [non-breaching] party; it is a decision by that party as to how it should proceed in the wake of the breaching party's nonperformance. In other words, 'an election is not a waiver of any rights under the contract but rather a choice between two inconsistent remedies for breach of the contract.'" *ESPN*, 76 F.Supp.2d at 389 (internal citation omitted). Specifically, Gemco could have given written notice of termination of the Agreement by March 16, 2013 and sued Al Maya for total breach. That is, Gemco could have either elected to terminate or to continue the Agreement, but it could not do both at the same time. When Gemco renewed the Agreement, it did not waive the right to bring an action for damages against Al Maya for partial breach, but it could not later decide to terminate the contract based on that breach. *Id.*

**D. The Agreement's Termination clause**

58.     Gemco relies on the second sentence of Article 8 and argues that it was entitled to terminate the Agreement at any time on three months' prior notice. It argues that Al Maya is at most entitled to lost profits calculated over a period of three months. Al Maya contends that lost profits should be calculated over a period of two-years.

59.     The Panel rejects Gemco's interpretation of Article 8. First, accepting Gemco's construction of the second sentence of Article 8 would render a portion of the first sentence superfluous. Only the first sentence of Article 8 addresses the termination of the Agreement. It gives either party the right to terminate the Agreement by providing timely written notice of termination at least three months prior to the renewal date. The second sentence, on which Gemco focuses, does not mention the right to terminate the Agreement. It only addresses the right to terminate "this arrangement." If that second sentence was construed to allow Gemco to terminate the Agreement at any time, by simply providing three months' prior written notice to Al Maya, the right to terminate set forth in the first sentence would become superfluous. The Panel rejects an interpretation of Article 8 that renders superfluous the only portion of that Article that specifically addresses the right to terminate the Agreement.

60.     Second, the second sentence of Article 8, which discusses the right to terminate "this arrangement," immediately follows the provisions of the first sentence on renewal and termination. The parties' decision to use the term "agreement" or "Agreement" in the first sentence and "arrangement" in the second reflects that they intended to give different meaning to these terms. *See, e.g., Eastman Kodak Co. v. Altek Corp.*, 936 F.Supp. 2d 342, 355 (S.D.N.Y. 2013). The reference to "this arrangement" in the second sentence means that either party could terminate the renewal and termination scheme by providing three months' prior written notice to

the other side. Once the Agreement automatically renewed, however, it remained in effect for its two-year term.[12] Having ruled that Gemco breached the Agreement, the Panel proceeds to the analysis of damages.

### E. Damages

#### (a) Lost profits resulting from the wrongful termination of the Agreement

61.    For the foregoing reasons, Al Maya is entitled to an award of lost profits, for the period October 2013 to June 15, 2015. Both parties have submitted expert evidence on the calculation of these damages. Al Maya's expert, Carlyn Irwin, is a principal of Cornerstone Research. She has been a "litigation consultant and expert witness for 20 years." (Tr. at 533.) She has "worked on hundreds of litigation matters, including damages, tort matters, intellectual property, et cetera." (*Id.*) She has a Master of Business Administration from the University of Southern California. (*Id.* at 534.) Gemco's expert, Maureen Loftus, is a principal of StoneTurn Group. She has similarly provided economic and financial consulting assistance to clients in a variety of industries. (Loftus Rep. at 1; Tr. 682.) Ms. Loftus has a bachelor of science in economics from the Wharton School of the University of Pennsylvania. (*Id.*)

62.    Both experts estimated Al Maya's damages on the assumption Gemco was found liable for its failure to give Al Maya timely written notice of termination of the Agreement. Both experts conducted but-for analyses in an effort to project sales of AG products from October 2013 to June 2015, and the costs Al Maya would have incurred making these sales. (Tr. at 746; Loftus Rep. at 8; Irwin Rep. at 12.)

63.    As more fully described below, the Panel finds Ms. Loftus's analysis more reliable than Ms. Irwin's analysis. There are at least two major flaws with the analysis of Al Maya's expert. First, Ms. Irwin's projection of the AG growth rate in October 2013 to June 2015 is based on rates experienced several years earlier, under significantly different conditions. Ms. Irwin projected a growth rate of 17 percent, the average of growth rates experienced in 2008-2011. The growth rate of AG products reached a plateau during that period, however. (Loftus Rep. at 15.) The growth rate "then dropped steeply, from 17 percent in 2011 to 8 percent in 2012." (Loftus at 15-17; Tr. 685, 746-49.)[13] It was not appropriate for Ms. Irwin to give disproportionate weight to growth rates experienced several years before the period of the projection, under markedly different market conditions, at a time Al Maya's costs and compensation structure was significantly different.

64.    In contrast, Ms. Loftus examined the entire period 2005-2013 and concluded that actual sales data from the period closest in time to the period of the projection was more reliable. Ms. Loftus applied a growth rate of 8 percent to project sales of AG products during the period

---

[12] The principal drafter of the Agreement is not known. On the Al Maya side, the two witnesses did not know who drafted the Agreement. Ashok Purswani testified that he only became aware of its existence after the termination in September 2013 and speculated that he "might have seen the agreement" in 2007. (Tr. at 234-35.) Deepak Pagarani, Al Maya's Chief Executive Officer, testified that he does not know who drafted that agreement. (Tr. at 209.) On the Gemco side, Kevin Egan, Gemco's President, testified that Gemco stands by the Stipulation and Order (Al Maya Ex. 2) and offered no evidence on who drafted it. (Tr. at 351.)

[13] As described above, Gemco changed Al Maya's compensation structure in January 2011. (*Supra* at 4 n.4.)

October 2013-June 2015.  (*Id.* at 17; Tr. at 745-49, 687.)[14]  The Panel concludes that this approach, which relies on the growth rate experienced in 2012, is more reliable.[15]

65.     Second, conducting a lost profit analysis requires estimating the costs that Al Maya would have incurred in achieving the incremental revenues.  These "avoided costs" consist of the difference between the costs that would have been incurred at the higher volume of sales, but for the termination, and the costs actually incurred.  (Loftus at 18-19, citing Mark A. Allen, Robert E. Hall, and Victoria A. Lazear, "Reference Guide on Estimation of Economic Damages" in Reference Manual on Scientific Evidence, pp. 449-50, Gemco Ex. 330.)

66.     In order to perform her analysis, Ms. Irwin extensively relied on a document attached to the Declaration of Sangram Ghandi, an Al Maya Accounts Manager.  Mr. Ghandi submitted his Declaration a day before Ms. Irwin submitted her expert report, and it forms the basis of Ms. Irwin's analysis.  In particular, in order to project Al Maya's incremental profit margin, Ms. Irwin averaged the contribution margins set forth in Exhibit B to Mr. Ghandi's Declaration for the years 2004 to 2013.

67.     There are significant problems with Exhibit B to Mr. Ghandi's Declaration.  Among other things, (1) there is a significant difference between data in Mr. Ghandi's Exhibit B and documentary evidence of Al Maya's actual costs.  For instance, Mr. Ghandi's Exhibit B indicates that Al Maya offered 5.6 percent rebates to customers in 2013, but Al Maya's internal emails reflected that these rebates amounted to 8.9 percent (Gemco Ex. 133.)  The rebates constitute a critical element of the incremental profit margin calculation.

(2) Mr. Ghandi's Declaration did not state how he defined certain key costs, such as "selling and distribution expense," or "variable indirect costs," and how he determined which costs fell into which categories.  This is a problem because Mr. Ghandi's costs allocation had a material impact on the calculation of incremental profit margins.  Mr. Ghandi's analysis also did not explain why a portion of these "selling and distribution expenses" was included in his calculation of the contribution margin, but other portions were excluded;

(3) Mr. Ghandi's analysis did not describe what personnel expenses were included or excluded from the analysis of incremental profit margin;

(4) no information was provided about how Mr. Ghandi's spreadsheets were prepared nor how Al Maya kept its books; and

(5) no information was provided about Mr. Ghandi's background and qualifications, nor the instructions he received from Al Maya, his employer, in preparing that analysis.

(Tr. at 764-68, 692, 695; Loftus Rep. at 11-13.)

---

[14] Ms. Loftus used, as a starting point, Exhibit B's contribution margin of 10 percent in 2012, the full year closest to the projection period.  She applied a downward adjustment of 2 percent based on record evidence regarding the costs Al Maya incurred.  (Loftus Rep. at 21.)

[15] Based on the evidence adduced in the arbitration, the Panel concludes that 2012 was not an anomalous year.  (Tr. 373-74, 669-70, 685-87; Egan W. St. ¶¶ 438-441.)

68.     It was not appropriate for Ms. Irwin to rely on analyses of an Al Maya employee who was not made available for cross-examination at the hearing, in particular when his Declaration and exhibits suffer from red flags and flaws.[16]

69.     Ms. Loftus estimated Al Maya's incremental lost profits for AG products at $4,109,000 for the period October 2013 through June 2015.  The Panel adopts this measure of damages.[17]

**(b) Lost Profits on products, other than AG**

70.     Al Maya claims that it is entitled to lost profits on non-AG products.  According to Al Maya, the parties entered into an oral agreement appointing Al Maya as Gemco's exclusive distributor of these other products in the U.A.E.  Gemco concedes that Al Maya was its exclusive distributor with respect to Diamond aluminum foil, (Egan W. St. ¶¶ 46-47), but denies that Al Maya was its exclusive distributor with respect to any other non-AG products.

71.     The Panel finds that Al Maya was Gemco's exclusive distributor of Diamond aluminum foil in the U.A.E., but that Al Maya has failed to meet its burden of proving that it was Gemco's exclusive distributor of other non-AG products.  Al Maya has also failed to meet its burden of proving that the renewal and termination provision in the Agreement also applied to the oral contract to distribute Diamond foil in the U.A.E.  The oral contract to distribute Diamond products did not provide for any fixed duration and could be terminated by either party, upon reasonable notice, customary in the industry.  *See, e.g., Creative Foods Corp. v. Chef Francisco, Inc.,* 92 A.D. 2d 462, 462 (1st Dept 1983).  The two agreements are different, and while a 21-month termination period for the Agreement may be reasonable, it would not be reasonable for the oral agreement.  This is particularly true where the oral agreement provided for the distributorship of but one product, Diamond aluminum foil, compared to the numerous AG products distributed by Al Maya under the Agreement.  Documentary evidence in the arbitration indicates that a period of approximately three months is reasonable.  (Al Maya Ex. 14 (Article 2.2); Gemco Ex. 296.)  Further, given that the parties appear to have agreed in the Agreement that a three-month termination period was appropriate under certain circumstances, and that neither party has provided compelling evidence of other "customary industry" practice, the Panel finds a three-month termination period to be reasonable for Diamond products.

72.     On January 6, 2016, the Panel requested both sides to provide a breakdown of the alleged lost profits for non-AG brands.  According to Gemco's lost profits analysis, Al Maya suffered damages of $136,000 relating to Diamond products for the three month period October - December 2013.  According to Al Maya's analysis, these damages amount to $163,000.  On January 12, the Panel asked the parties to explain the $27,000 difference in their calculations.  Both sides submitted letters on that topic on January 20, 2016.  The Panel concludes that

---

[16] For substantially the same reason, the Panel excludes the Declaration of Mulchand Jethanand Pagarani, dated September 21, 2015.  (Al Maya Ex. 233.)  Al Maya submitted that proposed Declaration on the last day of the arbitration hearing.  The witness was not made available for cross-examination.  This proposed Declaration did not comply with the process set forth by the Panel.

[17] Ms. Irwin also gave disproportionate weight to earlier years.  According to Ms. Loftus's analysis, Ms. Irwin gave 78 percent weight to the years 2004-2011, even though these years are far less relevant.  (Loftus at 22.)

Gemco's calculation is more reliable.[18]  Accordingly, Al Maya's lost profits relating to Diamond products amount to $136,000.

**(c) Lost profits on orders placed by Al Maya, but not fulfilled prior to the September 26, 2013 termination**

73.     Prior to September 26, 2013, Al Maya sent purchase orders to Gemco for AG and non-AG products, which Gemco did not fulfill in light of its anticipated termination of the Agreement.  Both experts have estimated lost profits based on these unfulfilled orders, using assumptions on applicable incremental profit margins.  For the reasons set forth above, the Panel agrees with Ms. Loftus's assumptions.  Ms. Loftus concluded that approximately $74,000 in lost profits are attributable to unfulfilled orders of AG products.  (Loftus Rep. at 24.)  Al Maya has failed to meet its burden of proving damages and the relevant terms of the oral contracts regarding non-AG products.

**(d) Gemco's sales to other U.A.E. distributors prior to September 26, 2013**

74.     Al Maya alleges that Gemco's sales to two distributors in the U.A.E., Spire and Lal's Trading Company ("LTC"), prior to September 28, 2013, breached the exclusivity provision of the Agreement.  Al Maya also claims that Gemco's sales of non-AG brands to Spire prior to September 26, 2013 breached the oral contract entered into by Al Maya and Gemco.

<u>Spire</u>

75.     Gemco sold approximately $9 million worth of products to Spire, from 2007 to September 26, 2013, approximately $6 million of which consisted of non-AG goods.  (Loftus Rep. at 25; Irwin Rep. at 21-22.)  The Panel finds that all of the products that Gemco sold to Spire were designed for re-export outside of the U.A.E.  The Panel further finds that the Agreement did not apply to sales of AG products within the U.A.E. for re-export outside of that territory.  The Agreement appointed Al Maya as "Sole Agent/Exclusive Distributors for the 'merchandise' [AG goods] for the entire territory of the U.A.E. (hereinafter called 'the designated territory')."  It does not mention the sales of products to consumers outside of the U.A.E. nor sales for re-export outside of the territory.

76.     Mr. Pagarani, the CEO of Al Maya, described the market for re-export as follows: "The Al Ras market is where you would sell for re-export.  It's a market where people come from East Africa, from India, Pakistan; and they're able to buy, say, a hundred cases from one trader, 50 from another, consolidate it and make a container and take it home." (Tr. at 164.)  Because of requirements of U.A.E. law, the products sold in the domestic and re-export markets are different.  (Tr. at 166-67.)  AG products designed for re-export did not have an expiry date and could not be sold domestically.  *(Id.)*  Given the specificity of the re-export market, the Panel

---

[18] The parties were in substantial agreement on the reasons for the $27,000 difference.  In particular, the experts used different contribution margins and growth rates to calculate lost profits.  The Panel concludes that Ms. Loftus's analyses of the contribution margins and growth rates for non-AG products are more reliable than Ms. Irwin's analyses.  Second, Ms. Irwin's calculations of lost profits included sales to Spire International LLC ("Spire"), another distributor in the U.A.E., and the Panel concludes that these sales are not relevant for the reasons described below.  (*Infra* at 18-19.)

finds that, had the parties intended to cover that market, the Agreement would have expressly addressed it.

77.     Instead, the Agreement focuses on domestic sales, including Al Maya's obligation to promote sales and to make arrangements for advertising. These promotional and advertising requirements were only relevant to sales for consumption within the U.A.E.. Accordingly, the Panel, concludes that Gemco's sales to Spire did not breach any exclusivity provision, and no damages are owed in connection with these sales.

## LTC

78.     All of the products that Gemco sold to LTC were non-AG products, and none of these sales included Diamond aluminum products. (Loftus Rep. at 26.) As described above, *supra* at 17, the Panel has found that the only oral exclusive distributorship agreement entered into by Gemco and Al Maya involved Diamond products. The Panel concludes that sales of other non-AG products to LTC did not breach any exclusivity provision, and thus, no damages are owed.

### (e) Unrealized Economic Benefits of Marketing and Brand Development Expenses and Listing Fees

79.     Al Maya seeks an award of $8,978,000 in partial reimbursement of promotion and marketing expenses and certain listing fees incurred beginning in 2004.[19] According to Al Maya's expert, it incurred these fees with the expectation of realizing future economic benefits. (Irwin Rep. 23-26.)

80.     The Panel concludes that these amounts are not an appropriate component of Al Maya's damages. These expenses were incurred in the ordinary course of business every year and were necessary expenditures to achieve Al Maya's sales. Al Maya did not amortize these expenses and reported them as current expenses. (Tr. 673.) It incurred these expenses with the understanding that Gemco could terminate the Agreement, and any unrealized benefit would be lost. (Tr. at 674-76.)

### (f) Outstanding Debit Notes

81.     Al Maya seeks to recover $221,000 in connection with certain debit notes. These are amounts that Al Maya under its compensation arrangement with Gemco. The evidence adduced in the arbitration reflects, however, that Al Maya seeks to be reimbursed for "two debit notes for American Garden mayonnaise that we [Gemco] found afterwards, based on information received from tracking the containers through the steamship line, that these containers were left out in the U.A.E. heat which the containers effectively become an oven." (Tr. at 174.) Gemco refused to pay for these debit notes for spoiled products that Al Maya was not able to timely store in its warehouse. (*Id.* at 375.) The Panel finds that Al Maya is not entitled to any damages in connection with these debit notes. Al Maya also provided insufficient documentation with respect to other debit notes. Gemco paid $1.1 million in connection with other debit notes in November 2014. The Panel finds that Al Maya is entitled to $9,000 in connection with the debit

---

[19] Listing fees are paid by distributors to retailers in the U.A.E. in order to place products on their shelves. (Tr. at 657.)

notes and also prejudgment interest on $1,087,921, at 3.5%, from September 28, 2013 through November 11, 2014. (Egan W. St. ¶¶ 474-78; Panicker W. St. ¶¶ 285-95; Irwin Rep. Ex. 5A.).[20]

**(g) Losses Related to Inventory Subsequent to Termination**

82.     Al Maya seeks an award of $363,000, resulting from the disposal of inventory following the termination of the Agreement. The Panel concludes that no damages are due to Al Maya, which failed to mitigate its damages.

83.     As described above, *supra* at 8, in an October 2, 2013 email, Gemco gave Al Maya three options to dispose of Al Maya's inventory. (Gemco Ex. 163, Egan W. St. ¶ 389.) A meeting was scheduled for October 3, 2013 to discuss these options. (Tr. 830-32, 1029.) At that meeting, however, Al Maya declined to discuss these options and indicated that it had a binding written distributor agreement with Gemco. *(Id.)* At the arbitration hearing, Mr. Pagarani acknowledged that Gemco offered Al Maya three options to dispose of the inventory, and that he rejected them because "none of them had any input from me to decide on these options," and Gemco did not mention how precisely Al Maya would be paid. (Tr. at 128-30.)

84.     Al Maya subsequently retained the inventory and, in March 2014, requested Gemco to buy back the unsold inventory. Gemco declined given that the inventory was at, or close to, expiration. Al Maya then negotiated with the new distributor which agreed to buy the American Garden products and paid Al Maya $700,000. Apparently, some of the products could not be sold by the new distributors for expiration reasons, and Gemco reimbursed NTDE $62,000 for the expired goods. (Egan W. St. ¶¶ 414-418; Egan Rebuttal W. St. ¶¶ 139-142.)

85.     Under New York law, Al Maya had a duty to mitigate its damages. It was Al Maya's burden to demonstrate that it acted reasonably in disposing of the inventory. Al Maya did not pursue Gemco's options and has not met its burden of proving that it acted reasonably.

**(h) Losses related to additional rebates subsequent to termination**

86.     Al Maya seeks an award of $252,000, because it was allegedly required to pay additional rebates to certain retailers following termination. (Irwin Rep. at 28.). Al Maya claims that eleven customers required Al Maya to offer rebates, in 2014 and 2015, and that these rebates were greater than those offered to them in 2013. Al Maya's expert extensively relies on Mr. Ghandi's Declaration that "various retailers required Al Maya pay them higher rebates because of the decrease in volume of product supplied by Al Maya." (Ghandi Decl. ¶ 2, Al Maya Ex. 64.) As described above, Al Maya did not make Mr. Ghandi available for cross-examination. The Panel concludes that Al Maya has failed to prove the existence of a correlation between the termination of the Agreement and higher rebates, in 2014 and 2015. This is particularly true because Gemco has adduced evidence that rebates also increased prior to 2013. (Loftus Rep. at 30-31.)

---

[20] Gemco made a payment of $1,087,921 to Al Maya on debit notes, on or about November 11, 2014. Al Maya is entitled to an amount of prejudgment interest through November 11, 2014.

**(i) Prejudgment interest**

87.     The AAA Commercial Arbitration Rules provide at R-47(d)(i) that the tribunal's award may include "interest at such rate and from such date as the arbitrator(s) may deem appropriate." Thus, the tribunal has broad discretion as to pre-award interest rates.

88.     Noting that the Stipulation and Order provides for application of New York law, Al Maya argues for an award of 9 percent pre-award interest pursuant to NY CPLR § 5004.  However, in an international arbitration such as this, where the parties have not specifically agreed to any particular interest rate and no evidence was presented as to actual borrowing costs, we believe that the better course is to apply a commercial rate in the relevant currency. *See, e.g.,* Matthew Secomb, "A Uniform, Three-Step Approach to Interest Rates in International Arbitration," in: Kroell, Mistelis et al. (eds.), International Arbitration and International Commercial Law, Synergy, Convergence and Evolution (Kluwer 2011), p. 431; David J. Branson and Richard E. Wallace, Jr., "Awarding Interest in International Commercial Arbitration: Establishing a Uniform Approach," 28 Va. J. Int'l. L. 919, 933 (1988) (citing ICC Case No. 3903,  in which the arbitrators awarded "a realistic rate of interest" in light of the "truly international flavor" of the dispute;  the tribunal observed that NY CPLR § 5004 is part of CPLR Article 50, which concerns court judgments and that CPLR Article 75, which concerns arbitration,  does not refer to § 5004). The Panel exercises its discretion to apply the prime, or market, rate based on the bank prime loan rate.  The bank prime loan rate on September 28, 2013 was 3.25%. The amount of prejudgment interest, from September 28, 2013 to March 4, 2016, is $336,356.64.[21]  Al Maya is entitled to an additional amount of interest on certain debit notes amounting to $42,666.88.

**Costs**

89.     Under Articles 47(c), 53, 54, and 55 of AAA's Commercial Arbitration Rules, the Panel has wide discretion to allocate the costs of the arbitration as it considers appropriate, including administrative costs, arbitrators' fees and costs, and legal fees and costs.  In international arbitration proceedings, tribunals frequently exercise their discretion to apply the principle that "*costs follow the event*", which means that the parties bear the costs of the arbitration in shares corresponding to their measure of success in these proceedings.

90.     Al Maya claims that it is entitled to $23,642,000 as damages.[22]  For the reasons described above, the Panel has concluded that Al Maya is entitled to an award of damages of $4,254,000.

91.     Al Maya has incurred $4,797,444 in fees and costs in connection with these proceedings, including the SDNY Litigation.  The Panel finds that it is reasonable to award Al Maya $1,100,000 in fees and costs.  In concluding that this award of costs is reasonable, the Panel has

---

[21]Al Maya seeks an award of punitive damages in the amount of either $23.5 million in its pre-hearing briefs, or ten times the amount of compensatory damages.  (Tr. at 1116.)  Al Maya, however, acknowledges that this dispute "fundamentally, at bottom, is a breach of contract case."  (Tr. at 1074.)  There are no significant public interests involved, and the respective conduct of the parties does not warrant the imposition of any punitive damages in this arbitration.

[22] Al Maya also claims that it is entitled to recover $1,530,000 in litigation fees and costs incurred in the SDNY Litigation.  According to the Stipulation and Order, the Panel "will have discretion in awarding costs in the arbitration to award any costs and attorney's fees associated with this proceeding."  (Al Maya Ex. 2, ¶ 5.)

reviewed the parties' submissions, the amount of work performed by each side in the arbitration, and the number of attorneys representing each side.  In assessing a reasonable amount of legal fees, the Panel is also mindful that Al Maya incurred materially higher fees than Gemco.  Al Maya incurred $1,530,000 in fees and costs in the SDNY Litigation (including expert fees). Gemco incurred $339,450.71 in connection with those proceedings.  Al Maya incurred $3,267,444 in fees and costs in the arbitration, and Gemco incurred $1,321,920.  Accordingly, the Panel concludes that awarding Al Maya $1,100,000 is reasonable under the circumstances.

## AWARD

For the reasons stated above, the Panel awards as follows:

- Respondent Global Export Marketing Co., Ltd  shall pay to Claimant Al Maya the following sums:

    (1) $4,254,000 in damages;
    (2) $379,023.52 in prejudgment interest; and
    (3) $1,100,000 in legal fees and costs.

- The administrative fees and expenses of the AAA/ICDR, totaling US$24,800.00 as well as the Tribunal's compensation and expenses, totaling US$250,663.78, shall be borne as incurred by the parties

- This Final Award is in full settlement of all claims submitted in this arbitration. All claims and relief requested, but not expressly granted in this award, are hereby expressly denied.

This Final Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, NY, USA.

3/3/2016
_____
Date

Daniel Schimmel
_____
Daniel Schimmel, Chair


_____
Date

_____
Grant Hanessian, Arbitrator


_____
Date

_____
Robert G. Cohen, Arbitrator

23

We hereby certify that, for the purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, NY, USA.

3/3/2016
Date

Daniel Schimmel, Chair

Date

Grant Hanessian, Arbitrator

2/4/2016
Date

Robert G. Cohen, Arbitrator

We hereby certify that, for the purposes of Article I of the New York Convention of 1958 on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, NY, USA.

3/3/2016
_____
Date

Daniel Schimmel, Chair

3/4/2016
_____
Date

Grant Hanessian, Arbitrator

_____
Date

Robert G. Cohen, Arbitrator

23

State of New York

County of New York                } SS:

I, Daniel Schimmel, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

3/3/2016
Date

_Daniel Schimmel_
Daniel Schimmel, Arbitrator

State of New York

County of New York                } SS:

On this __3rd__ day of March, 2016, before me personally came and appeared Daniel Schimmel, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

**ERIK A. HUESTIS**
Notary Public, State of New York
No. 02HU6295028
Qualified in Dutchess County
Commission Expires Dec. 23, 2017

24

State of New York

County of New York

} SS:

I, Grant Hanessian, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

March 4 2016
_____
Date

_____
Grant Hanessian, Arbitrator

State of New York

County of New York

} SS:

On this 4th day of March, 2016, before me personally came and appeared Grant Hanessian, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public
PATRICIA HUGGER
NOTARY PUBLIC, State of New York
No. 01HU4679870
Qualified in Nassau County
Certificate Filed in New York County
Commission Expires May 31, 2018

25

State of New York

County of New York Suffolk        } SS:

I, Robert G. Cohen, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Final Award.

3/4/16

Date

_____
Robert G. Cohen, Arbitrator

State of New York

County of New York        } SS:
        Suffolk

On this 4 day of March, 2016, before me personally came and appeared Robert G. Cohen, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ANDREW MORSE
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN SUFFOLK COUNTY
NO. 01MO6199759
MY COMMISSION EXPIRES 01/19/201 7

26

# EXHIBIT B

AMERICAN ARBITRATION ASSOCIATION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AL MAYA TRADING ESTABLISHMENT,

                Claimant,

     v.

GLOBAL EXPORT MARKETING CO., LTD.,

                Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AAA Case No. 01-14-001-3760

**OPENING PRE-HEARING BRIEF OF CLAIMAINT
AL MAYA TRADING ESTABLISHMENT**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035
*Attorneys for Claimant*

independent and egregious tortious conduct against Al Maya; and (i) its legal fees and costs associated with the instant arbitration.

1.    **Lost Profits:  Approximately $12,298,000**

First and most fundamentally, Al Maya is due profits it would have earned had Gemco not terminated the parties' relationship. *See, e.g., Oneonta Dress Co. v. Ozona-USA, Inc.*, 120 A.D.2d 899, 901 (3d Dep't 1986) ("The loss of entire profit is a proper measure of contract damages and may be recovered when the injured party offers some adequate basis for computing the amount."); *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007). Here, if Gemco had not terminated Al Maya, Al Maya would have continued to serve as Gemco's exclusive distributor for all its brands in the UAE, including American Garden (governed by the Agency Agreement) and Other Gemco Brands (governed by the oral agreement) until at least June 15, 2015, the date of the expiration of the next term of the contract. *See* Ex. 1 ¶ 8. Al Maya would have continued to earn profits selling Gemco's products to its various customers accordingly.  More specifically, as Al Maya's expert, Carlyn Irwin, explains: "if Gemco had continued to perform under the Agency Agreement and had not stopped fulfilling Al Maya's orders for American Garden products, it is expected that Al Maya would have continued to place orders with Gemco and/or Zams and that Gemco and/or Zams would have fulfilled those orders at market prices[,] [and] it is expected that Al Maya would have sold American Garden products in the UAE at a profit commensurate with its historical incremental profit on other sales of these products during the relevant time period." Irwin Report ¶ 47.

Consequently, Al Maya is due the profits it would have earned from selling and distributing Gemco's American Garden goods throughout the UAE "but-for" Gemco's breach of the Agency Agreement from at least September 26, 2013 through the would-be end of the contract term—June 15, 2015. Using data Gemco and Al Maya produced in discovery, Ms.

# EXHIBIT C

*Engelmayer, P.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/27/2014
```

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :

AL MAYA TRADING ESTABLISHMENT,    :

                     Petitioner,    :     Case No. 14-cv-0275-PAE

         v.                    :     **STIPULATION AND ORDER**

GLOBAL EXPORT MARKETING CO., LTD.,   :

                   Respondent.    :
                                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

IT IS HEREBY STIPULATED AND AGREED by and between the undersigned counsel for the parties herein, and it is hereby Ordered, as follows:

(1) The parties agree to submit to arbitration all claims arising out of or related to the 1999 Agency Agreement. Petitioner will serve a statement of claim within 14 days from the date of this Order.

(2) The American Arbitration Association shall administer the arbitration pursuant to its Rules for Commercial Arbitration;

(3) The authenticity, validity, and enforceability of the 1999 Agency Agreement shall not be at issue in the arbitration and no reference to its validity, the authority of the signatories to sign the agreement, or any other issue related to its formation shall be raised in the arbitration;

(4) New York law shall apply in the arbitration to all procedural and substantive issues;

(5) Each party shall bear its own costs in connection with this proceeding, but the arbitrators will have discretion in awarding costs in the arbitration to award any costs and attorneys' fees associated with this proceeding;

(6) The Petition is stayed, pending the resolution of the arbitration.

Dated:  New York, New York
       August 25, 2014

By: _____

Mitchell A. Karlan
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-3827

*Attorneys for Petitioner Al Maya Trading
Establishment*

By: _____

Raymond J. Aab
Omar Lopera
61 Broadway, Suite 2500
New York, NY 10006
(917) 551-1300

*Attorneys for Respondent Global Export
Marketing Co., Ltd.*

**SO ORDERED**    8/27/14

Paul A. Engelmayer
_____

101790980.1

2

# EXHIBIT D

# GIBSON DUNN

Gibson, Dunn & Crutcher LLP

200 Park Avenue
New York, NY 10166-0193
Tel 212.351.4000
www.gibsondunn.com

Mitchell A. Karlan
Direct: +1 212.351.3827
Fax: +1 212.351.5254
MKarlan@gibsondunn.com

September 4, 2014

VIA OVERNIGHT DELIVERY

American Arbitration Association
Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043

> Re:   *Demand for Arbitration: Al Maya Trading Establishment v. Global
> Export Marketing Co., Ltd.*

Dear Sir or Madam:

Claimant Al Maya Trading Establishment ("Al Maya") hereby demands arbitration of its claims
against Respondent Global Export Marketing Co., Ltd.'s ("Global") for money damages arising
out of or relating to the attached Agency Agreement, dated June 16, 1999, and entered into
between Al Maya and Global (the "Agency Agreement") (attached hereto as Exhibit 1).
Pursuant to a Stipulation and Order signed by the parties and "so ordered" by Judge Paul A.
Engelmayer of the U.S. District Court for the Southern District of New York on August 27, 2014
(the "Stipulation and Order") (attached hereto as Exhibit 2), the parties agree to, and the Court
has ordered, the submission of these claims to arbitration administered by the American
Arbitration Association ("AAA") pursuant to its Commercial Arbitration Rules (the "Rules").

Al Maya elects the Flexible Fee Schedule. A check in the amount of $4,500 made out to the
AAA is enclosed as payment of the initial filing fee.

Pursuant to the Rules, we provide the AAA with the following additional information:

1.   Names, Addresses, and Contact Information for the Parties and Their
     Representatives

The claimant is Al Maya Trading Establishment, a United Arab Emirates company having an
address at Airport Road, Al Garhoud P.O.Box 8476, Dubai, United Arab Emirates, Tel: 971-4-
605-8555, Fax: 971-4-282-6660, ramzi@almaya.ae. Al Maya is represented by Mitchell A.
Karlan of Gibson, Dunn & Crutcher LLP, 200 Park Avenue, 47th Floor, New York, NY 10166,
Tel: 212-351-4000, Fax: 212-351-5254, mkarlan@gibsondunn.com. Al Maya is a family-owned
company that, among other things, process, packs, and distributes food products in the UAE and
other countries in the Middle East and Europe. The products are supplied to Al Maya by various
suppliers around the world.

GIBSON DUNN

The respondent is Global Export Marketing Co., Ltd., a company located at 25 West 31st Street, 8th floor, New York, NY 10001, Tel: 212-268-9930, Fax: 212-268-9935, kevin@globalxport.com. Global is represented by Raymond A. Aab, Esq., 61 Broadway, Suite 2500, New York, NY 10006, Tel: 917-551-1300, Fax: 917-551-0030, rja120@msn.com. Global is one of the companies that supplies food products to Al Maya for distribution, primarily under the American Garden brand name. The American Garden brand has been established in the UAE over a period of time by the joint efforts of Al Maya and Global.

2.  Statement of the Claim, Including Relief Sought and Amount Involved

Al Maya's claims arise out of Global's breaches of the Agency Agreement, including its unilateral termination of the parties' longstanding business relationship, its unauthorized sale of American Garden brand products to distributors other than Al Maya for sale, distribution, or passage in or through the UAE, and continuing defaults arising out of non-payment of monies due, and Global's tortious actions surrounding the termination of the parties' contractual relationship, including Global's tortious interference with Al Maya's contracts and business relations. For all claims arising out of or relating to the Agency Agreement, including Al Maya's breach of contract and tort claims, and non-payment of monies due, Al Maya seeks money damages in the amount of $50 million, together with interest. In addition, it seeks its costs and attorneys' fees, including, in accordance with the agreement of the parties (*see* Exhibit 2 ¶ 5), its costs and attorneys' fees incurred in prosecuting the court proceeding that resulted in the Stipulation and Order.

Al Maya notes that pursuant to the Stipulation and Order, the authenticity, validity, and enforceability of the Agency Agreement shall not be at issue in the arbitration, nor shall the authority of the signatories to sign the agreement or any other issue related to the Agency Agreement's formation be raised in the arbitration.

3.  Requested Locale

Al Maya requests that the arbitration be held in New York, New York. Al Maya notes that pursuant to the Stipulation and Order, New York law shall apply in the arbitration to all procedural and substantive issues.

4.  Number of Arbitrators

Al Maya requests that its claims be heard and determined by a Tribunal comprised of three arbitrators.

5.  Reservation of Rights

Al Maya reserves its right to amend and/or supplement this Demand for Arbitration by adding claims, by altering the amount of damages sought, or by seeking additional equitable or monetary relief. In addition, Al Maya reserves its right to, and intends to, supplement this Demand for Arbitration (inclusive of the Statement of the Claim above) with a more detailed statement of its claims, in accordance with the timetable to be set by the arbitrators, pursuant to the Rules (*see, e.g.*, Rule P-2(a)(iii)).

GIBSON DUNN

Respectfully submitted,

Mitchell A. Karlan

Attachments
cc:     Raymond A. Aab., Esq. (Counsel for Respondent)

EXHIBIT 1

AGENCY AGREEMENT

This agreement is made on this 16th day of June 1999 by and between :

First Party
Global Export Marketing Co Ltd
11 Penn Plaza, Suite 1031
New York, NY 10001 , USA

Second Party
M/s Al Maya Trading Est.
P.O. Box 11096
Dubai
United Arab Emirates

PREAMBLE
Whereas the First Party is the manufacturer and or exporter of American Garden branded items, ( Hereinafter called " merchandise" ) and they are desirous of appointing Second party as their Sole Agent/ Exclusive Distributors

NOW THIS AGREEMENT WINTNESSETH AS UNDER:
01. The above preamble shall form an integral and indivisible part of this agreement.
02. The First party hereby appoints the Second party as their Sole Agent / Exclusive Distributors for the " merchandise" for the entire territory of UAE ( hereinafter called "the designated territory .")
03. The " Merchandise" covered under this agreement , American Garden branded items, manufactured, processed and or exported by the First Party from time to time.
04. The First Party shall not directly sell the " Merchandise " to the " designated territory" through any channels except the Second Party .
05. The Second Party agrees to promote sales of the " merchandise" supplied to them by the First party in the "designated territory" and to make arrangements for necessary advertisements and or promotions,etc. as may be mutually arid by and between the parties hereto from time to time.
06. The First Party shall supply to the Second party the " merchandise" at such price or prices as is / are mutually agreed between the parties.
07. The First Party hereby reserve all of its rights concerning the Trade marks , Brand Names and Designs of the " merchandise" except for the Second party being authorized to use the said Trade Marks and or Brand Names including Designs for the purpose of marketing the " merchandise " in its capacity as Agent/ Distributor of the " merchandise ."
08. This agreement shall remain valid for a period of two ( 2 ) years from the date herein above written in this Agreement and hall automatically renewed for equal period (s) unless either party informs the other in writing at least three ( 3 ) months in advance

of its intention to terminate this agreement. Either party reserves the right to terminate this arrangement by giving the other party clear three ( 3 ) months written notice of its intention to do so.

09. All disputes and or differences that may arise between the parties hereto out of or in relation to or in connection with this agreement or for any breach thereof shall be settled through arbitration by a practicing Auditor or Lawyer in internationally reputed Audit / law firm in accordance with the rules and regulations obtaining in the United Arab Emirates and the award given by the arbitrator shall be final and binding on both the parties.

IN WITNESS WHEREOF,  the parties hereto have signed this agreement on the day, month and year herein above written .

For and on behalf of

Global Export Marketing Co Ltd

For and on behalf of

Al Maya Trading Est.



THE JAMAICA CHAMBER OF COMMERCE
Organized in 1919 as The Merchants Association of Jamaica
NEW YORK STATE

GLOBAL EXPORT MARKETING CO., LTD.
ELEVEN PENN PLAZA, SUITE 1031
NEW YORK, N.Y. 10001
U.S.A.

P. O. Box 11096 Dubai
AL MAYA TRADING EST

EXHIBIT 2

Engelmayer, P.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: | |
| DATE FILED: 8/27/2014 | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

AL MAYA TRADING ESTABLISHMENT,

     Petitioner,

   v.

GLOBAL EXPORT MARKETING CO., LTD.,

     Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 14-cv-0275-PAE

**STIPULATION AND ORDER**

IT IS HEREBY STIPULATED AND AGREED by and between the undersigned counsel for the parties herein, and it is hereby Ordered, as follows:

(1) The parties agree to submit to arbitration all claims arising out of or related to the 1999 Agency Agreement.  Petitioner will serve a statement of claim within 14 days from the date of this Order.

(2) The American Arbitration Association shall administer the arbitration pursuant to its Rules for Commercial Arbitration;

(3) The authenticity, validity, and enforceability of the 1999 Agency Agreement shall not be at issue in the arbitration and no reference to its validity, the authority of the signatories to sign the agreement, or any other issue related to its formation shall be raised in the arbitration;

(4) New York law shall apply in the arbitration to all procedural and substantive issues;

(5) Each party shall bear its own costs in connection with this proceeding, but the arbitrators will have discretion in awarding costs in the arbitration to award any costs and attorneys' fees associated with this proceeding;

(6) The Petition is stayed, pending the resolution of the arbitration.

Dated:  New York, New York
        August 25, 2014

By: _____          By: _____
    Mitchell A. Karlan                       Raymond J. Aab
    GIBSON, DUNN & CRUTCHER LLP              Omar Lopera
    200 Park Avenue                         61 Broadway, Suite 2500
    New York, NY 10166-0193                 New York, NY 10006
    (212) 351-3827                          (917) 551-1300

    *Attorneys for Petitioner Al Maya Trading*    *Attorneys for Respondent Global Export*
    *Establishment*                               *Marketing Co., Ltd.*


**SO ORDERED**                    8/27/14

_Paul A. Engelmayer_
_____

                        ᵗᵐ


101790980.1


2

# EXHIBIT E



**document production**

Saleem Mawji  to: AShapiro

Cc:   MKarlan, Joseph FLEISCHMAN

Bcc:  "Maureen Loftus", Amanda Bowen, FAZAL, kevin, bob

06/01/2015 04:40 PM

From:    Saleem Mawji/NMM

To:      AShapiro@gibsondunn.com,

Cc:      MKarlan@gibsondunn.com, Joseph FLEISCHMAN/NMM@NMM

---

Akiva:

We are providing you with our objections to the production on a rolling basis. See below.

1.      P&Ls - We require the complete Profit and Loss Statements for the entity (or entities) that sold AG for the years 2003 through Sept 2013 ytd and for any related entity where expenses relating to the sales, marketing and distribution of AG may appear.  The P&Ls will allow us to determine the incremental costs, which we need in order to determine the lost incremental profit, if any, that Al Maya would have earned resulting from any lost incremental AG sales.

2.      Any claimed losses resulting from tortious interference with AM's contracts/business relations - We require emails and correspondence regarding the loss, if any, of other business because of the loss of AG.  We also require the sales numbers, costs and profit from other existing brands sold, or planned new brands to be sold, such as American Kitchen, by Ltd in order to determine if there truly was any loss in other sales because of the loss of AG.

3.      We request supporting documentation for each line item in the excel spreadsheets that contain lists of expenditures as to which Al Maya is seeking recoupment as damages.  By way of example, the second tab of Excel sheet entitled Brand Development Expenses has no supporting documentation.   Without such documentation, we cannot verify these alleged expenses. As further example, we do not have the supporting agreements that identify the rebates paid to the key accounts, i.e., Carrefour, Lulu, etc.  We require the listing agreements, rebate agreements, and business development agreements with all these key accounts and all other AG customers.

Saleem Mawji, Esquire

**Norris, McLaughlin & Marcus, P.A.**

515 West Hamilton Street, Suite 502

Allentown, PA 18101

t: 484-765-2231 f:610-391-1805 e:smawji@nmmlaw.com

NJ:  721 Route 202-206, Box 5933, Bridgewater, NJ 08807
NY:  875 Third Avenue, 8th Floor, New York, NY 10022

**Please note: Effective April 27, our address will be 515 West Hamilton Street, Suite 502, Allentown, PA 18101.  All other contact information will remain the same.  Please update your records accordingly.

Pursuant to Treasury Regulations, any U.S. Federal tax advice contained in this communication, unless otherwise stated, is not intended and cannot be used for the purpose of avoiding tax-related penalties.

Notice: Unless explicitly and conspicuously designated as 'E-Contract Intended', this e-mail does not constitute a contract offer, a contract amendment, or an acceptance of a contract offer. This e-mail does not constitute consent to the use of sender's contact information for direct marketing purposes or for transfers of data to third parties.

Notice: This message and any attached file is intended for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. Nothing in this e-mail message should be construed as a legal opinion. If you have received this communication in error, please notify me immediately by reply e-mail and delete all copies of the original message. Thank you.

# EXHIBIT F

# Norris McLaughlin & Marcus, P.A.

ATTORNEYS AT LAW

721 Route 202-206
Suite 200
P.O. Box 5933
Bridgewater, NJ 08807
T: 908-722-0700
F: 908-722-0755

June 15, 2015

Via Email

Daniel Schimmel, Esq.
Foley Hoag, LLP
Americas Tower
1177 Avenue of the Americas
5th Floor
New York, NY 10036

Grant Hanessian, Esq.
Baker & McKenzie LLP
452 Fifth Avenue
New York, New York 10018

Robert G. Cohen, Esq.
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, New York 10019-6142

Re:   Case Number: 01-14-0001-3760
      Al Maya Trading Establishment v. Global Export Marketing Co., Ltd.

Dear Gentlemen:

In this matter, the claimant is Al Maya Trading Establishment ("AMTE") and the respondent is Global Export Marketing Co., Ltd. ("GEMCO"). We submit this letter on behalf of GEMCO to address the serious deficiencies in AMTE's May 29, 2015 document production.

There are four categories of documents that GEMCO needs but AMTE refuses to produce: (i) documents on revenues and all expenses, and other financial information, at the claimant AMTE level; (ii) documents as to Al Maya International, Ltd (FZC) ("Ltd (FZC)")'s sales of private label products, Heinz products, and GEMCO products outside of the United Arab



Bridgewater, NJ • New York, NY • Allentown, PA
www.nmmlaw.com

Daniel Schimmel, Esq.
Grant Hanessian, Esq.
Robert G. Cohen, Esq.
June 15, 2015
Page 2

Emirates ("U.A.E."); (iii) draft distribution agreements and draft contracts between Ltd (FZC)

and GEMCO; and (iv) documents as to Ltd (FZC)'s effort to develop a brand named American

Kitchen.

A. **GEMCO needs financial information at the AMTE level, not just at the Ltd (FZC) level**

AMTE is claiming $50 million in damages for GEMCO's allegedly wrongful September

2013 termination of a distributorship of GEMCO's American Garden brand food products in the

U.A.E. A major component of AMTE's damage claim is lost profits. GEMCO therefore needs

claimant AMTE's historical detailed revenue and expense information.

From approximately 2002 until the September 2013 termination, GEMCO shipped and

invoiced Ltd (FZC), not claimant AMTE. AMTE does not dispute this. Indeed, the handful of

GEMCO invoices documents that AMTE did produce reflect such shipping and invoicing. (This

goes to GEMCO's whole point that AMTE does not have standing to assert claims against

GEMCO, but the panel said this is a matter for another day.)

In request 1 of GEMCO's first request for documents, Exhibit A, GEMCO asks for "all

AMTE balance sheets, cash flow statements, and income statements, both audited and

unaudited." Similarly, in request 24 of GEMCO's first request for documents GEMCO asks for

"all Ltd (FZC) balance sheets, cash flow statements, and income statements, both audited and

unaudited."

AMTE's extremely limited production contains documents reflecting that since at least

2003 Ltd (FZC) was the parent company for a number of entities, currently about twenty seven,

44739-5

Daniel Schimmel, Esq.
Grant Hanessian, Esq.
Robert G. Cohen, Esq.
June 15, 2015
Page 3

including claimant AMTE. These documents also show that Ltd (FZC), the parent, currently had

2014 revenue of $412 million.

The extremely limited financial information that AMTE has produced thus far contains

financial information only at the level of Ltd (FZC), the parent entity for a number of entities,

and, on top of that, only gross profit information for the parent entity and what purports to be

gross profit information for American Garden sales by Ltd (FZC). Although GEMCO contends

that AMTE does not have standing, right now AMTE is the claimant, but as claimant it has not

produced its profit and loss information, and certainly not its net profit and loss information.

Accordingly, GEMCO advised AMTE that it needs the following specific information, but

AMTE thus far has not produced it.

1. GEMCO needs the profit and loss statement for the entity (or entities) that sold

GEMCO's American Garden brand products from 2002 through September 2013 and for any

related entity where expenses and costs relating to the sales, marketing, and distribution of

American Garden may appear. These statements will allow GEMCO to determine the

incremental costs, which GEMCO needs to determine the lost incremental profit, if any, that

AMTE would have earned resulting from any alleged lost incremental sales of GEMCO product.

AMTE has not produced such documents. Without those documents, GEMCO cannot verify the

expenses and costs.

In a summary sheet that it created and produced in this litigation, AMTE asserts that the

supposed gross margin on GEMCO's American Garden products in its last year, 2013, was

18.88%. However, in a July 27, 2013 Ltd (FZC) email to GEMCO, Exhibit E---that is, a

44739-5

Daniel Schimmel, Esq.
Grant Hanessian, Esq.
Robert G. Cohen, Esq.
June 15, 2015
Page 4

document not manufactured for purposes of litigation---Ltd (FZC) stated, just two months before

the September 2013 termination, the "Audit Department has given me the datas [sic] which

drastically showing [sic] the negative picture" on Ltd (FZC)'s sale of American Garden products.

The email stated that Ltd (FZC) was losing money on American Garden products.  AMTE did

not include this email in its production.  GEMCO needs to see the information relating to net

profit, that is, information inclusive of all costs and expenses.

    2. GEMCO needs emails and correspondence regarding the alleged loss, if any, of other

business because of the loss of GEMCO products to determine the value, if any, of AMTE's

claim for tortious interference with AMTE's business relations.  GEMCO needs the sales

numbers, costs, and profit from other existing brands sold, or planned new brands to be sold,

such as American Kitchen, by Ltd (FZC) to determine if there truly was any loss in other sales

because of the loss of American Garden.  AMTE thus far has produced none.

    3. AMTE produced Excel spread sheets with summary information on expenditures

supposedly made to promote the American Garden Brand, apparently in support of its claim for

damages, but AMTE did not produce any back up for that summary information.  GEMCO needs

the supporting documentation for each line item.  For example, GEMCO needs to see the

agreements that the distributor, apparently Ltd (FZC), had with its customers to see if rebates

supposedly paid match up with what the agreements provide.  AMTE has produced no customer

agreements.

    4. In request 34 of GEMCO's first document requests, Exhibit A, GEMCO asks for "all

documents relating to, referring, or pertaining to the profitability or lack of profitability of

44739-5

Daniel Schimmel, Esq.
Grant Hanessian, Esq.
Robert G. Cohen, Esq.
June 15, 2015
Page 5

American Garden products for Ltd (FZC)."  GEMCO asks for documents such as the Ltd

(FZC)'s July 27, 2013 email discussed above, which GEMCO just happened to get as a recipient

of this email.  AMTE very well may have other documents, in addition to the profit and loss

information GEMCO has requested, addressing profitability or the lack of it.  AMTE, though,

produced nothing on this topic, not even the July 27, 2013 email.

   B. GEMCO needs information on improper Ltd (FZC) sales: Al Manal private label,

Heinz, and American Garden outside of the U.A.E.

      1. Ltd (FZC) sales of Al Manal-packed private label goods in competition with

      GEMCO's products

   Al Manal Food Stuff Packaging, LLC ("Al Manal"), a subsidiary of Ltd (FZC) as was

AMTE, packed for Ltd (FZC) private label products for which there was an American Garden

counterpart and which Ltd (FZC) then sold in competition with American Garden.  Furthermore,

Al Manal packed the private label goods for Ltd (FZC) within Ltd (FZC)'s own facility.

   In numerous written and oral communications, GEMCO constantly protested these

private label sales as violating the GEMCO-Ltd (FZC) arrangement, but Ltd (FZC) never

stopped the sales.  To the contrary, in the three or so years leading up to GEMCO's termination

of Ltd (FZC) (and not AMTE), Ltd (FZC) dramatically escalated the number of Al Manal-

packed private label products that it sold for which there was an American Garden counterpart.

Ltd (FZC)'s sale of its private label products reduced its sales of GEMCO's products, retarded

the development and growth of GEMCO's American Garden brand and products, and was one of

the key factors leading to GEMCO's termination of Ltd (FZC).

44739-5

Daniel Schimmel, Esq.
Grant Hanessian, Esq.
Robert G. Cohen, Esq.
June 15, 2015
Page 6

GEMCO needs information as to the extent of this Al Manal-Ltd (FZC) private label

activity.  In requests 30 D., 36, and 45 of GEMCO's first document requests, Exhibit A, and in

requests 1, 2, and 3 of GEMCO's fifth document requests, Exhibit D, GEMCO seeks that

information, but AMTE has produced none of it.

AMTE claims the documents are not relevant and are confidential or constitute trade

secrets.  As to relevance, these documents are directly pertinent to the termination and the scope

of AMTE's claim for damages.  As to confidentiality and trade secrets, GEMCO advised AMTE

that it is prepared to enter into an appropriate protective order and, in the interim, AMTE

forthwith should produce the documents for attorneys' eyes only.

2.  Ltd (FZC) sales of Heinz products in competition with GEMCO products

Ltd (FZC) sold Heinz products in competition with GEMCO products.  In written and

oral communications, GEMCO protested these Heinz sales as violating the GEMCO-Ltd (FZC)

arrangement, but Ltd (FZC) continued selling Heinz.  In request 32 of GEMCO's first document

requests, Exhibit A, GEMCO requested "[a]ll agreements between Ltd (FZC) or any related

entity and Heinz for the distribution of Heinz brand products."   AMTE has produced none.

3.  Ltd (FZC) sales of American Garden products outside of the U.A.E.

GEMCO contends that (i) under the GEMCO-Ltd (FZC) arrangement, Ltd (FZC) sale of

GEMCO products was to be confined to the U.A.E., and (ii) Ltd (FZC) violated the arrangement

by selling GEMCO products outside of the U.A.E.  In written and oral communications,

GEMCO protested these non-U.A.E. sales as violating the GEMCO-Ltd (FZC) arrangement, but

Ltd (FZC) never stopped these sales.

44739-5

Daniel Schimmel, Esq.
Grant Hanessian, Esq.
Robert G. Cohen, Esq.
June 15, 2015
Page 7

In requests 1 and 2 of GEMCO's third document requests, Exhibit C, GEMCO requests, as to Ltd (FZC) sales outside of the U.A.E., "documents setting forth identification of those customers and summarizing by year the amount of those sales."

C. GEMCO needs the draft distribution agreements and draft contracts between Ltd (FZC) and GEMCO.

For the purposes of this proceeding, GEMCO stipulated to the existence and enforceability of a June 16, 1999 Agency Agreement between GEMCO and AMTE. There never was, however, a written distributorship agreement between GEMCO and Ltd (FZC), the entity to which GEMCO shipped the goods and the entity it billed for eleven years. Moreover, in the nearly four years prior to its termination, Ltd (FZC) repeatedly tried to get GEMCO to enter into a distributorship agreement with it. That never happened.

In request 31 of GEMCO's first document requests, Exhibit A, GEMCO asks for "[a]ll draft distribution agreement and draft contracts between Ltd (FZC) and GEMCO."

These documents are relevant to GEMCO's argument that (i) any agreement between AMTE and GEMCO is inapplicable to GEMCO's dealings with Ltd (FZC); and (ii) AMTE, only a paper company that never did business with GEMCO, has no standing to assert the instant claims against GEMCO and has suffered no damages.

D. GEMCO needs the documents related to American Kitchen

Soon after GEMCO terminated it, Ltd (FZC) started to develop a brand called American Kitchen through an entity named Accura International ("Accura"). Ltd (FZC) claims that

44739-5

Daniel Schimmel, Esq.
Grant Hanessian, Esq.
Robert G. Cohen, Esq.
June 15, 2015
Page 8


GEMCO tortiously interfered with its development efforts.  The American Kitchen story may

also implicate the issue of the duty to mitigate any alleged damages.

In requests 8 and 9 of GEMCO's second requests, Exhibit B, GEMCO asks for

documents about Accura and these development efforts.  AMTE thus far has produced none.

Conclusion

GEMCO's document requests conform to the Panel's e-mail of 5/12/15, 11:51 AM,

confirming that "**all** issues will be addressed during the merits hearing on September **8-11,**

**2015.**" (Emphasis added).  GEMCO needs the foregoing documents to defend itself against

AMTE's $50 million damage and therefore asks the Panel to order AMTE to produce them

forthwith.

Very truly yours,

*Saleem Mawji*

SALEEM MAWJI


cc:     Mitchell A. Karlan, Esq.
        Akiva Shapiro, Esq.


44739-5

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of an ) | |
| Arbitration between: ) | |
| ) | |
| Al Maya Trading Est. ) | AAA Case No. |
| ) | 01-14-0001-3760 |
| Claimant ) | |
| ) | |
| v. ) | |
| ) | |
| Global Export Marketing Co ltd ) | |
| ) | |
| Respondent ) | |

## GEMCO's FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Respondent Global Export Marketing Co., Ltd ("GEMCO") requests that Al Maya

Trading Establishment ("AMTE") produce the following documents, on a rolling basis, pursuant

to a schedule that the arbitrators establish and upon which the parties agree.

## DEFINITIONS

A.      "You," "your," "AMTE," or "claimant" refers to Al Maya Trading Establishment,

or anyone else acting for or on behalf of same.

B.      The terms "communicate" and "communication" refer to the discussion in any

form whether oral or written of the topic covered by any request for production and to the

exchange of information whether oral or written regarding said topic.  The terms refer to all such

exchanging or discussing regardless of who initiated such exchanging or discussing.

C.      The term "with regard to" means pertinent to, material to, germane to, relative to,

applicable to, or having any interrelationship whatsoever, direct or indirect.

44185v2

D.      "Identify," as applied to persons, means to make known with respect to such person the name, address (business and residence), telephone number (business and residence), employer, if any, and position of employment.

E.      "Specify," shall have its customary and broad meaning and shall include, without limitation, the requirement that Claimant name, state or make known explicitly, and detail, without ambiguity, the information requested; and further, that claimant particularize, define, show clearly, set apart and designate the information requested.

F.      "Document," shall have its customary and broad meaning and shall include, without limitation, the following items whether printed, recorded or reproduced by any other mechanical process, or written or produced by hand, and whether or not claimed to be privileged against discovery on any ground; agreements, communications, correspondence, letters, telephone messages, telexes, memoranda, notebooks, summaries, reports or records of telephone conversations, summaries or records of conversations or interviews, diaries, statistical statements, maps, specifications, drawings, studies, analysis, evaluations, surveys, graphs, charts, plans, minutes or records of meetings, or conferences, expressions or statements of policy, lists of persons, drafts of any documents, original or preliminary notes, tapes, discs, data cells, drums, printouts, photographs, or any other data compilations from which information can be obtained, and papers and things similar to the foregoing however denominated by claimant.

G.      "Person," has its customary broad meaning and shall also include any corporation, partnership, sole proprietorship, unincorporated association, joint venture, or any other organization.

H.      "Demand" in this matter refers to the arbitration demand that claimant filed on September 4, 2014.

I.      "Answer' in this matter refers to the answer that GEMCO filed on September 22,

2014.

INSTRUCTIONS

A.      In answering each request for production: state the name of the person answering

that request for production; state whether the information furnished is within the personal

knowledge of such person; identify all persons assisting in the answer to that request; and

identify all persons to whom such information is a matter of personal knowledge.

B.      If any of these requests cannot be answered in full, you must answer to the extent

possible, specifying the reasons for your inability to answer the remainder and stating whether

information, knowledge, or belief you have concerning the unanswered portion.

C.      If any document was, but is no longer, in the possession of claimant or subject to

its control, state what disposition was made of it, the date thereof, identify the person or persons

responsible for such disposition, and the policy, rule, order, or other authority by which such

disposition was made.

D.      This request for production of documents is continuing and whenever additional

information responsive to them, but not supplied in answer to them, is obtained by claimant it

shall be supplied to respondent as though expressly requested by separate request for production

of documents.

REQUESTS

AMTE

1.      From January 1, 1999 through March 31, 2015, all AMTE balance sheets, cash

flow statements, and income statements, both audited and unaudited.

3

2.      From January 1, 1999 through March 31, 2015, all AMTE filings and submissions, including but not limited to tax returns, that AMTE made to any governmental or quasi-governmental authority.

3.      All documents related to the incorporation and formation of AMTE.

4.      Documents showing the past and current ownership of AMTE.

5.      All documents setting forth who controls AMTE and who controlled AMTE in the past.

6.      From June 16, 1999 through March 31, 2015, all agreements or contracts between AMTE and:

     A.      Al Maya Lals Company;

     B.      Al Maya Lals Int. (FZC), LLC;

     C.      Al Maya International, Ltd (FZC);

     D.      Al Manal Food Processing Company;

     E.      GEMCO.

7.      From June 16, 1999 through March 31, 2015, all emails and other correspondence between AMTE and:

     A.      Al Maya Lals Company;

     B.      Al Maya Lals Int. (FZC), LLC;

     C.      Al Maya International, Ltd (FZC);

     D.      Al Manal Food Processing Company:

     E.      GEMCO.

Al Maya Lals Company

8.      From January 1, 1988 through December 31, 2002, all Al Maya Lals Company balance sheets, cash flow statements, and income statements, both audited and unaudited.

9.      From January 1, 1988 through December 31, 2002, all filings and submissions, including but not limited to tax returns, that Al Maya Lals Company made to any governmental or quasi-governmental authority.

10.     All documents related to the incorporation and formation of Al Maya Lals Company.

11.     Documents showing the past and current ownership of Al Maya Lals Company

12.     All documents setting forth who controls Al Maya Lals Company and who controlled Al Maya Lals Company in the past.

13.     From June 16, 1999 through March 31, 2015, all agreements or contracts between Al Maya Lals Company and:

      A.      AMTE;

      B.      Al Maya Lals Int. (FZC), LLC;

      C.      Al Maya International, Ltd (FZC);

      D.      Al Manal Food Processing Company;

      E.      GEMCO.

14.     From June 16, 1999 through March 31, 2015, all emails and other correspondence between Al Maya Lals Company and:

      A.      AMTE;

      B.      Al Maya Lals Int. (FZC), LLC;

      C.      Al Maya International, Ltd (FZC);

      D.      Al Manal Food Processing Company:

E.    GEMCO.

15.    All draft distribution agreements and draft contracts between Al Maya Lals Company and GEMCO.

Al Maya Lals Int. (FZC), LLC

16.    From January 1, 2002 through December 31, 2004, all Al Maya Lals Int. (FZC), LLC balance sheets, cash flow statements, and income statements, both audited and unaudited.

17.    From January 1, 2002 through December 31, 2004, all Al Maya Lals Int. (FZC), LLC filings and submissions, including but not limited to tax returns, that Al Maya Lals Int. (FZC), LLC made to any governmental or quasi-governmental authority.

18.    All documents related to the incorporation and formation of Al Maya Lals Int. (FZC), LLC

19.    Documents showing the past and current ownership of Al Maya Lals Int. (FZC), LLC.

20.    All documents setting forth who controls Al Maya Lals Int. (FZC), LLC and who controlled Al Maya Lals Int. (FZC), LLC in the past.

21.    From June 16, 1999 through March 31, 2015, all agreements or contracts between Al Maya Lals Int. (FZC), LLC and:

A.    AMTE;

B.    Al Maya Lals Company;

C.    Al Maya International, Ltd (FZC);

D.    Al Manal Food Processing Company;

E.    GEMCO.

22.     From June 16, 1999 through March 31, 2015, all emails and other correspondence between Al Maya Lals Int. (FZC), LLC and:

    A.     AMTE;

    B.     Al Maya Lals Company;

    C.     Al Maya International, Ltd (FZC);

    D.     Al Manal Food Processing Company;

    E.     GEMCO.

23.     All draft distribution agreements and draft distribution contracts between Al Maya Lals Int. (FZC), LLC and GEMCO.

Al Maya International, Ltd (FZC) ("Ltd (FZC)")

24.     From January 1, 2002 through March 31, 2015, all Ltd. FZC balance sheets, cash flow statements, and income statements, both audited and unaudited,

25.     From January 1, 2002  through March 31, 2015, all Ltd (FZC) filings and submissions, including but not limited to tax returns, that Ltd (FZC) made to any governmental or quasi-governmental authority.

26.     All documents related to the incorporation and formation of Ltd (FZC).

27.     Documents showing the past and current ownership of Ltd (FZC).

28.     All documents setting forth who controls Ltd (FZC) and who controlled Ltd (FZC) in the past.

29.     From June 16, 1999 through March 31, 2015, all agreements or contracts between Ltd (FZC) and:

    A.     AMTE;

    B.     Al Maya Lals Company;

7

    C.     Al Maya Lals Int. (FZC), LLC;

    D.     Al Manal Food Processing Company;

    E.     GEMCO.

30.     From June 16, 1999 through March 31, 2015, all emails and other correspondence between Al Maya International, Ltd (FZC) and:

    A.     AMTE;

    B.     Al Maya Lals Company;

    B.     Al Maya Lals Int. (FZC), LLC;

    C.     Al Manal Food Processing Company;

    D.     GEMCO.

31.     All draft distribution agreements and draft contracts between Ltd (FZC) and GEMCO.

32.     All agreements or contracts between Ltd (FZC) or any related entity and Heinz for the distribution of Heinz brand products.

33.     From January 1, 2002 through December 31, 2013, all documents relating, referring, or pertaining to sales trends and forecasts for the sale of American Garden products.

34.     From January 1, 2002 through December 31, 2013, all documents relating, referring, or pertaining to the profitability or lack of profitability of American Garden products for Ltd (FZC).

35.     From January 1, 2002 through December 31, 2013, all documents relating, referring, or pertaining to GEMCO's sale of American Garden products to Spire or any other entity in the United Arab Emirates other than Ltd (FZC).

8

36.     From January 1, 2002 through March 31, 2015, all emails and other correspondence relating to Ltd (FZC)'s obtaining and selling its own private label products.

37.     From January 1, 2002 through March 31, 2015, all emails and other correspondence relating to Ltd (FZC) sales force's ability or inability to handle major accounts.

38.     From January 1, 2002 through September 30, 2013, all emails and other correspondence relating to Ltd (FZC)'s transparency or lack of transparency with GEMCO on key accounts.

39.     From January 1, 2002 through September 30, 2013, all emails and other correspondence relating to Ltd (FZC)'s distributor structure.

40.     From January 1, 2002 through September 30, 2013, all emails and other correspondence relating to the strengths and weaknesses of Ltd (FZC)'s warehouse operation.

41.     From January 1, 2002 through September 30, 2013, all emails and other correspondence relating to Ltd (FZC)'s forecasting and order systems for GEMCO products.

42.     From January 1, 2002 through September 30, 2013, all emails and other correspondence relating to Ltd (FZC)'s declining to order, or delaying the ordering of, GEMCO products.

43.     From January 1, 2002 through September 30, 2013, all emails and other correspondence relating to Ltd (FZC)'s administration of its sales force and the distributorship function.

44.     From January 1, 2002 through September 30, 2013, all emails, other correspondence, and all other documents related to American Garden market share both generally and broken down by product category.

Al Manal Food Processing ("Al Manal")

45.      All Al Manal balance sheets, cash flow statements, and income statements, both audited and unaudited from January 1, 2002 through December 31, 2013.

46.      All filings and submissions, including but not limited to tax returns, that Al Manal made to any governmental or quasi-governmental authority from January 1, 2005 through December 31, 2013.

47.      All documents related to the incorporation and formation of Al Manal.

48.      Documents reflecting the past and current ownership of Al Manal.

49.      All documents setting forth who controls Al Manal and who controlled Al Manal in the past.

50.      From June 16, 1999 through March 31, 2015, all agreements or contracts between Al Manal and:

      A.      AMTE;

      B.      Al Maya Lals Company;

      C.      Al Maya Lals Int. (FZC), LLC;

      D.      Al Maya International, Ltd (FZC).

NORRIS McLAUGHLIN & MARCUS, P.A.
Attorneys for Respondent Global Export Marketing
Co., Ltd.

By: _Joseph J. Fleischman_

JOSEPH J. FLEISCHMAN
A Member of the Firm

Saleem Mawji
515 West Hamilton Street, Suite 502,
Allentown, PA 18101

Dated: April 27, 2015
      Bridgewater, NJ

10

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of an<br>Arbitration between:<br><br>Al Maya Trading Est.<br><br>          Claimant<br><br>     v.<br><br>Global Export Marketing Co ltd<br><br>        Respondent | AAA Case No.<br><u>01-14-0001-3760</u> |

## GEMCO's SECOND REQUEST FOR PRODUCTION OF DOCUMENTS

Respondent Global Export Marketing Co., Ltd ("GEMCO") requests that Al Maya

Trading Establishment ("AMTE") produce the following documents, on a rolling basis, pursuant

to a schedule that the arbitrators establish and upon which the parties agree.

## DEFINITIONS

A.      "You," "your," "AMTE," or "claimant" refers to Al Maya Trading Establishment,

or anyone else acting for or on behalf of same.

B.      The terms "communicate" and "communication" refer to the discussion in any

form whether oral or written of the topic covered by any request for production and to the

exchange of information whether oral or written regarding said topic.  The terms refer to all such

exchanging or discussing regardless of who initiated such exchanging or discussing.

C.      The term "with regard to" means pertinent to, material to, germane to, relative to,

applicable to, or having any interrelationship whatsoever, direct or indirect.

44227  1

D.     "Identify," as applied to persons, means to make known with respect to such person the name, address (business and residence), telephone number (business and residence), employer, if any, and position of employment.

E.     "Specify," shall have its customary and broad meaning and shall include, without limitation, the requirement that Claimant name, state or make known explicitly, and detail, without ambiguity, the information requested; and further, that claimant particularize, define, show clearly, set apart and designate the information requested.

F.     "Document," shall have its customary and broad meaning and shall include, without limitation, the following items whether printed, recorded or reproduced by any other mechanical process, or written or produced by hand, and whether or not claimed to be privileged against discovery on any ground; agreements, communications, correspondence, letters, telephone messages, telexes, memoranda, notebooks, summaries, reports or records of telephone conversations, summaries or records of conversations or interviews, diaries, statistical statements, maps, specifications, drawings, studies, analysis, evaluations, surveys, graphs, charts, plans, minutes or records of meetings, or conferences, expressions or statements of policy, lists of persons, drafts of any documents, original or preliminary notes, tapes, discs, data cells, drums, printouts, photographs, or any other data compilations from which information can be obtained, and papers and things similar to the foregoing however denominated by claimant.

G.     "Person," has its customary broad meaning and shall also include any corporation, partnership, sole proprietorship, unincorporated association, joint venture, or any other organization.

H.     "Demand" in this matter refers to the arbitration demand that claimant filed on September 4, 2014.

2

I.      "Answer' in this matter refers to the answer that GEMCO filed on September 22, 2014.

## INSTRUCTIONS

A.      In answering each request for production: state the name of the person answering that request for production; state whether the information furnished is within the personal knowledge of such person; identify all persons assisting in the answer to that request; and identify all persons to whom such information is a matter of personal knowledge.

B.      If any of these requests cannot be answered in full, you must answer to the extent possible, specifying the reasons for your inability to answer the remainder and stating whether information, knowledge, or belief you have concerning the unanswered portion.

C.      If any document was, but is no longer, in the possession of claimant or subject to its control, state what disposition was made of it, the date thereof, identify the person or persons responsible for such disposition, and the policy, rule, order, or other authority by which such disposition was made.

D.      This request for production of documents is continuing and whenever additional information responsive to them, but not supplied in answer to them, is obtained by claimant it shall be supplied to respondent as though expressly requested by separate request for production of documents.

## REQUESTS

Accura International ("Accura")

1.      From September 1, 2013 through March 31, 2015, all Accura balance sheets, cash flow statements, and income statements, both audited and unaudited.

3

2.      From September 1, 2013 through March 31, 2015, all Accura filings and submissions, including but not limited to tax returns, that Accura made to any governmental or quasi-governmental authority.

3.      All documents related to the incorporation and formation of Accura.

4.      Documents showing the past and current ownership of Accura.

5.      All documents setting forth who controls Accura and who controlled Accura in the past.

6.      From September 1, 2013 through March 31, 2015, all agreements or contracts between Accura and:

      A.      Al Maya Lals Company;

      B.      Al Maya Lals Int. (FZC), LLC;

      C.      Al Maya International, Ltd (FZC);

      D.      Al Manal Food Processing Company.

7.      From September 1, 2013 through March 31, 2015, all emails and other correspondence between Accura and:

      A.      Al Maya Lals Company;

      B.      Al Maya Lals Int. (FZC), LLC;

      C.      Al Maya International, Ltd (FZC); and

      D.      Al Manal Food Processing Company.

8.      From September 1, 2013 through March 31, 2015, all emails and other correspondence between Accura and any United States-based food manufacturers and their representatives, including, but not limited to, the Fremont Company, Peppers Unlimited, Burnette Foods, Per Persson, and Icco Cheese Company, Inc.

9.      From September 1, 2013 through March 31, 2015, any and all documents relating, referring, or pertaining to the development, marketing, and sale of the American Kitchen brand.

10.     From January 1, 1999 through March 31, 2015, all general ledgers for AMTE.

11.     From January 1, 1988 through December 31, 2002, all general ledgers for Al Maya Lals Company.

12.     From January 1, 2002 through December 31, 2004, all general ledgers for Al Maya Lals Int. (FZC) LLC.

13.     From January 1, 2002 through March 31, 2015, all general ledgers for Al Maya International, Ltd (FZC).

14.     From January 1, 2002 through December 31, 2013, all general ledgers for Al Manal Food Processing.

15.     From September 1, 2013 through March 31, 2015, all general ledgers for Accura International.

16.     Native file format of all financial information requested in GEMCO's first request for production of documents, dated April 27, 2015, and this second request for production of documents.

> NORRIS McLAUGHLIN & MARCUS, P.A.
> Attorneys for Respondent Global Export Marketing
> Co., Ltd.
>
> By:  _Joseph J. F_____
>
> JOSEPH J. FLEISCHMAN
> A Member of the Firm
> 721 Route 202/206, Suite 200
> Bridgewater, New Jersey  08807
>
> SALEEM MAWJI
> 515 West Hamilton Street, Suite 502
> Allentown, Pennsylvania 18101

Dated: April 28, 2015

5

AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| In the Matter of an<br>Arbitration between: | ) | |
| | ) | |
| Al Maya Trading Est. | ) | AAA Case No. |
| Claimant | ) | 01-14-0001-3760 |
| | ) | |
| v. | ) | |
| | ) | |
| Global Export Marketing Co ltd | ) | |
| Respondent | ) | |
| | ) | |

GEMCO's THIRD REQUEST FOR PRODUCTION OF DOCUMENTS

Respondent Global Export Marketing Co., Ltd ("GEMCO") requests that Al Maya

Trading Establishment ("AMTE") produce the following documents, on a rolling basis, pursuant

to a schedule that the arbitrators establish and upon which the parties agree.

DEFINITIONS

A.      "You," "your," "AMTE," or "claimant" refers to Al Maya Trading Establishment,

or anyone else acting for or on behalf of same.

B.      The terms "communicate" and "communication" refer to the discussion in any

form whether oral or written of the topic covered by any request for production and to the

exchange of information whether oral or written regarding said topic.  The terms refer to all such

exchanging or discussing regardless of who initiated such exchanging or discussing.

C.      The term "with regard to" means pertinent to, material to, germane to, relative to,

applicable to, or having any interrelationship whatsoever, direct or indirect.

44244V2

D.     "Identify," as applied to persons, means to make known with respect to such person the name, address (business and residence), telephone number (business and residence), employer, if any, and position of employment.

E.     "Specify," shall have its customary and broad meaning and shall include, without limitation, the requirement that Claimant name, state or make known explicitly, and detail, without ambiguity, the information requested; and further, that claimant particularize, define, show clearly, set apart and designate the information requested.

F.     "Document," shall have its customary and broad meaning and shall include, without limitation, the following items whether printed, recorded or reproduced by any other mechanical process, or written or produced by hand, and whether or not claimed to be privileged against discovery on any ground; agreements, communications, correspondence, letters, telephone messages, telexes, memoranda, notebooks, summaries, reports or records of telephone conversations, summaries or records of conversations or interviews, diaries, statistical statements, maps, specifications, drawings, studies, analysis, evaluations, surveys, graphs, charts, plans, minutes or records of meetings, or conferences, expressions or statements of policy, lists of persons, drafts of any documents, original or preliminary notes, tapes, discs, data cells, drums, printouts, photographs, or any other data compilations from which information can be obtained, and papers and things similar to the foregoing however denominated by claimant.

G.     "Person," has its customary broad meaning and shall also include any corporation, partnership, sole proprietorship, unincorporated association, joint venture, or any other organization.

H.     "Demand" in this matter refers to the arbitration demand that claimant filed on September 4, 2014.

2

I.     "Answer' in this matter refers to the answer that GEMCO filed on September 22,

2014.

## INSTRUCTIONS

A.     In answering each request for production: state the name of the person answering

that request for production; state whether the information furnished is within the personal

knowledge of such person; identify all persons assisting in the answer to that request; and

identify all persons to whom such information is a matter of personal knowledge.

B.     If any of these requests cannot be answered in full, you must answer to the extent

possible, specifying the reasons for your inability to answer the remainder and stating whether

information, knowledge, or belief you have concerning the unanswered portion.

C.     If any document was, but is no longer, in the possession of claimant or subject to

its control, state what disposition was made of it, the date thereof, identify the person or persons

responsible for such disposition, and the policy, rule, order, or other authority by which such

disposition was made.

D.     This request for production of documents is continuing and whenever additional

information responsive to them, but not supplied in answer to them, is obtained by claimant it

shall be supplied to respondent as though expressly requested by separate request for production

of documents.

## REQUESTS

1.     From January 1, 2002 through December 31, 2014, for any sales that Ltd (FZC)

made to any persons or entities located outside of the United Arab Emirates, documents setting

forth identification of those customers and summarizing by year the amount of those sales.

3

2.      From January 1, 2002 through December 31, 2014, for any sales that Ltd (FZC)

made within the United Arab Emirates to any persons or entities whom Ltd (FZC) knew or had

reason to believe were then shipping the products to locations outside of the United Arab

Emirates, documents setting forth identification of those customers and summarizing by year the

amount of those sales.

<div style="margin-left:40%">

NORRIS McLAUGHLIN & MARCUS, P.A.
Attorneys for Respondent Global Export Marketing
Co., Ltd.

By:    _____

JOSEPH J. FLEISCHMAN
A Member of the Firm
721 Route 202/206, Suite 200
Bridgewater, New Jersey  08807

SALEEM MAWJI
515 West Hamilton Street, Suite 502
Allentown, Pennsylvania 18101

</div>

Dated: May 4, 2015

4

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of an<br>Arbitration between:<br><br>Al Maya Trading Est.<br><br>       Claimant<br><br>       v.<br><br>Global Export Marketing Co Ltd<br><br>       Respondent | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    AAA Case No.<br>   <u>01-14-0001-3760</u> |

## GEMCO'S FIFTH REQUEST FOR PRODUCTION OF DOCUMENTS

Respondent Global Export Marketing Co., Ltd ("GEMCO") requests that Al Maya

Trading Establishment ("AMTE") produce the following documents, on a rolling basis, pursuant

to a schedule that the arbitrators establish and upon which the parties agree.

### DEFINITIONS

A.    "You," "your," "AMTE," or "claimant" refers to Al Maya Trading Establishment,

or anyone else acting for or on behalf of same.

B.    The terms "communicate" and "communication" refer to the discussion in any

form whether oral or written of the topic covered by any request for production and to the

exchange of information whether oral or written regarding said topic.  The terms refer to all such

exchanging or discussing regardless of who initiated such exchanging or discussing.

C.    The term "with regard to" means pertinent to, material to, germane to, relative to,

applicable to, or having any interrelationship whatsoever, direct or indirect.

44387v3

D.     "Identify," as applied to persons, means to make known with respect to such person the name, address (business and residence), telephone number (business and residence), employer, if any, and position of employment.

E.     "Specify," shall have its customary and broad meaning and shall include, without limitation, the requirement that Claimant name, state or make known explicitly, and detail, without ambiguity, the information requested; and further, that claimant particularize, define, show clearly, set apart and designate the information requested.

F.     "Document," shall have its customary and broad meaning and shall include, without limitation, the following items whether printed, recorded or reproduced by any other mechanical process, or written or produced by hand, and whether or not claimed to be privileged against discovery on any ground; agreements, communications, correspondence, letters, telephone messages, telexes, memoranda, notebooks, summaries, reports or records of telephone conversations, summaries or records of conversations or interviews, diaries, statistical statements, maps, specifications, drawings, studies, analysis, evaluations, surveys, graphs, charts, plans, minutes or records of meetings, or conferences, expressions or statements of policy, lists of persons, drafts of any documents, original or preliminary notes, tapes, discs, data cells, drums, printouts, photographs, or any other data compilations from which information can be obtained, and papers and things similar to the foregoing however denominated by claimant.

G.     "Person," has its customary broad meaning and shall also include any corporation, partnership, sole proprietorship, unincorporated association, joint venture, or any other organization.

H.     "Demand" in this matter refers to the arbitration demand that claimant filed on September 4, 2014.

2

I.      "Answer' in this matter refers to the answer that GEMCO filed on September 22, 2014.

## INSTRUCTIONS

A.      In answering each request for production: state the name of the person answering that request for production; state whether the information furnished is within the personal knowledge of such person; identify all persons assisting in the answer to that request; and identify all persons to whom such information is a matter of personal knowledge.

B.      If any of these requests cannot be answered in full, you must answer to the extent possible, specifying the reasons for your inability to answer the remainder and stating whether information, knowledge, or belief you have concerning the unanswered portion.

C.      If any document was, but is no longer, in the possession of claimant or subject to its control, state what disposition was made of it, the date thereof, identify the person or persons responsible for such disposition, and the policy, rule, order, or other authority by which such disposition was made.

D.      This request for production of documents is continuing and whenever additional information responsive to them, but not supplied in answer to them, is obtained by claimant it shall be supplied to respondent as though expressly requested by separate request for production of documents.

## REQUESTS

### Al Maya International, Ltd (FZC)

1.      From January 1, 2002 through March 31, 2015, a summary by year of the monetary amount and units of Al Maya International, Ltd (FZC) ("Ltd. (FZC)") purchases of

3

private label goods manufactured by Al Manal Food Processing ("Al Manal") broken down by product category.

2.      From January 1, 2002 through March 31, 2015, a summary by year of the monetary amount and units of Ltd (FZC) sales of private label goods manufactured by Al Manal broken down by product category.

3.      From January 1, 2002 through March 31, 2015, a summary by year of the monetary amount paid as commissions or other incentives to LTD (FZC) salesmen for sales of private label goods manufactured by Al Manal broken down by product category.

4.      From January 1, 2002 through March 31, 2015, for each year the rate of commission or other incentives that Ltd (FZC) paid to its salesmen for sales of private label good manufactured by Al Manal broken by product category.

<u>Al Manal Food Processing</u>

5.      From January 1, 2002 through March 31, 2015, a summary by year of the monetary amount and units of Al Manal sales of private label goods to Ltd (FZC) broken down by product category.

6.      From January 1, 2002 through March 31, 2015, a summary by year of the monetary amount and units of Al Manal profits on the sales of private label goods to Ltd (FZC) broken down by product category.

7.      From January 1, 2002 through March 31, 2015, for each Ltd (FZC) salesmen a summary by year of the monetary amount of sales commissions or other incentives that Al Manal paid broken down by product category.

4

8.    From January 1, 2002 through March 31, 2015, for each year the rate of

commission or other incentives that Al Manal paid to Ltd (FZC) salesmen broken by product

category.

NORRIS McLAUGHLIN & MARCUS, P.A.
Attorneys for Respondent Global Export Marketing
Co., Ltd.

By: _Joseph J. Fleischman/bjd._
JOSEPH J. FLEISCHMAN
A Member of the Firm

Saleem Mawji
515 West Hamilton Street, Suite 502,
Allentown, PA 18101

Dated: May 12, 2015
Bridgewater, NJ

5

# DOCUMENT WITHHELD PENDING REQUEST TO FILE UNDER SEAL